IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 12, 2000 Session

## STATE OF TENNESSEE v. LONNIE TURNER

**Appeal from the Circuit Court for Rutherford County**
**No. 33793     James K. Clayton, Jr., Judge**

---

**No. M1999-01127-CCA-R3-CD - Filed June 5, 2001**

---

The defendant appeals from his convictions for first degree felony murder and aggravated rape, for which he received consecutive sentences of life and twenty-two years, respectively. The defendant contests the sufficiency of the evidence, whether certain statements which he made to investigators were taken in violation of his rights, the validity of the search warrant for samples of his hair and blood, certain evidentiary and procedural rulings of the trial court, the ordering of consecutive sentences, and the denial of his motion for a new trial based upon newly discovered evidence. We affirm the judgments of conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOSEPH M. TIPTON, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Scott Daniel, Murfreesboro, Tennessee, for the appellant, Lonnie Turner.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; John W. Price, Assistant District Attorney General; and J. Paul Newman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The defendant, Lonnie Turner, appeals as of right from his convictions by a Rutherford County Circuit Court jury for first degree felony murder and aggravated rape, a Class A felony. The trial court sentenced the defendant as a Range I, standard offender to life imprisonment for the murder conviction and twenty-two years for the aggravated rape conviction to be served consecutively. The defendant presents the following issues, some of which have a number of sub-issues:

I. The evidence was insufficient to find the defendant guilty beyond a reasonable doubt;

II. The trial court erred and denied the defendant his rights under the U.S. and Tennessee Constitutions by overruling his motions to suppress evidence;

III. The trial court erred in various rulings, denying the defendant his rights under both the U.S. and Tennessee Constitutions to due process, compulsory process, confrontation and his right to present a defense;

IV. The trial court erred in excluding testimony of defense witnesses;

V. The trial court committed prejudicial and reversible errors in its evidentiary and procedural rulings;

VI. The trial court denied the defendant a fair trial and right to due process under both the U.S. and Tennessee Constitutions by allowing the state to make improper arguments to the jury;

VII. The trial court erred and denied due process in sentencing the defendant to serve consecutive sentences on the rape and felony murder convictions which were based upon the same incident and for which no justifiable basis for consecutive sentencing exists; and

VIII. The trial court committed plain and reversible error by refusing to grant the defendant a new trial based upon newly discovered evidence.

The charges against the defendant resulted from the rape and murder of Sandra Coleman, whose body was found on January 6, 1995, at the Colony Square Apartments in Smyrna, Tennessee, where she resided. At trial, Cindy Nowlin, a friend and former coworker of the victim, testified as follows: Shortly after midnight on January 4, 1995, the victim called her from a Texaco station in Murfreesboro. As a result of the call, she went to the Texaco station where Murfreesboro police officers had stopped a car being operated by Coleman because they had received a telephone call that she was drinking and driving. Although the victim had passed a field sobriety test, the officers told her to call a friend for transportation because her driver's license was suspended. The victim did not appear to be under the influence of an intoxicant but was upset because she had been stopped by the police. The victim said that she was at the home of Moses Bess, the father of her two children, that she and Mr. Bess had a disagreement over the victim's drug use, and that she left his apartment after he slapped her.

Ms. Nowlin testified that she and the victim drove around Murfreesboro for approximately forty-five minutes before she took the victim to the victim's apartment. She said that the victim admitted developing a crack cocaine habit. She also was afraid of the defendant, referring to him as her crack dealer, because he wanted to trade crack cocaine for sexual relations with her and that "he would not take no for an answer." The victim never told her that she ever had consensual sex with the defendant. Ms. Nowlin stated that she left the victim at the victim's apartment at approximately 1:15 a.m. and returned to her own apartment. She said that she later asked a mutual friend, Brian Blair, who had previously had problems resulting from the use of cocaine, to talk to the victim about her drug problem.

Ms. Nowlin testified that she visited the victim at her apartment later that same day, January 4, 1995, at approximately 1:00 p.m., staying with her for about six hours, during which time they talked about the victim's stopping her use of cocaine. She stated that the victim said that she wanted to straighten out her life and get her two children back from Moses Bess. She said that the victim's mother had asked her to search the victim's apartment for illegal drugs and to see if the victim had any food. Ms. Nowlin testified that she did not find any evidence of drugs or drug usage in the apartment. She said that she was talking on the telephone with the victim later that evening when Brian Blair arrived at the victim's apartment.

Ms. Nowlin testified that she went to the victim's apartment on January 6, 1995, but received no answer to her knock on the door. Because of her concern, she went to the apartment manager to ask that he unlock the door to the victim's apartment. Upon entering the apartment, she saw the victim's body on the floor between a couch and a coffee table. She stayed in the victim's apartment for about five minutes. She noticed that a table and mini-blinds were broken and that the victim's clothing was scattered on the floor. She was still at the apartment complex when the paramedics and police arrived. Later that evening, she gave a statement to Detective Todd Spearman of the Smyrna Police Department.

Brian Blair testified as follows: He first met the victim in 1986 or 1987. On January 4, 1995, he arrived at the victim's apartment between 9:00 and 11:00 a.m. He drove the victim to the Texaco station where she had left her car, and they made plans to get together that evening for dinner. That evening, he and the victim drove to a Taco Bell located about ten minutes from the victim's apartment. A receipt from the Taco Bell showed that they purchased food at 7:47 p.m. They then returned to the victim's apartment where they ate the meal and spent between an hour and a half to two hours talking. The victim did not mention expecting to see any other person that evening. During their conversation, the victim told him that she wanted to quit using cocaine and that she was depressed about the life she had been leading. She said that she had sold almost everything she had to get money for crack cocaine and that her drug addiction had caused her to ask Moses Bess for food and support for her and their children. She said that Mr. Bess was keeping her under the influence of drugs to control her and that he had threatened her. She also told him that Mr. Bess had accused her of stealing Xanax from him and had hit her. She was afraid that Mr. Bess might tell the Tennessee Department of Human Services about her lifestyle. The victim never said that Mr. Bess

had threatened to kill her, but she did say that she was afraid of "Regina's boyfriend," whom Mr. Blair later determined was the defendant.

Mr. Blair testified that he was formerly a drug addict and that he believed the victim was showing signs of drug addiction. When he visited the victim in her apartment, her lip was swollen because, according to her, Moses Bess had slapped her the night before and she had burned herself with a crack pipe. He stated that he left the victim's apartment between 8:00 and 9:00 p.m. on January 4, 1995, and returned to his home in Triune, Tennessee. Mr. Blair said that he telephoned the victim the following day but received no answer. He later spoke with Cindy Nowlin, who also had unsuccessfully attempted to call the victim. Both Ms. Nowlin and the victim's mother called Moses Bess, attempting to locate the victim, but she was not at Mr. Bess's residence. At the request of Ms. Nowlin, he went to the victim's apartment to see if he could find her, but he was unsuccessful.

Jean Vernich, the manager of the Colony Square Apartments, testified as follows: On January 6, 1995, Cindy Nowlin asked her to use her pass key to unlock the door to the victim's apartment. After opening the door, she saw the victim lying in front of a couch and realized that she was dead. No one else was in the apartment at that time. She shouted to another resident to call the police and stayed with the victim's body until paramedics arrived.

Dr. Charles Harlan, medical examiner for Robertson and Clay Counties, testified as follows: On January 6, 1995, he went to the crime scene, which was the victim's apartment. He arrived between 7:00 and 7:30 p.m., and he examined the victim's body and took photographs. He began an autopsy of the victim at 11:15 p.m. He testified that the victim was thirty years of age, weighed one hundred two pounds, and was five feet, one inch in height. The victim's blood alcohol level was .02 percent, which he considered essentially negligible. The blood screen showed that the victim had taken Desipramine, a prescription anti-depressant medication. However, his tests showed that the victim had not used cocaine within the twelve hours prior to her death.

Dr. Harlan testified that the victim had a grooved depression around her neck, which was caused by an electrical cord. The victim, who was pregnant at the time of her death, had abrasions or scrapes around her right cheek, anterior chest, and left elbow. Written on the victim's anterior chest were the words "VICKTORY CANTRELL." He determined that these words were written with a brown eyebrow pencil. The victim's skin had a bluish discoloration, and the body had started to decompose. A blue, plastic flashlight had been inserted into the victim's vagina. In his opinion, the victim's death was caused by ligature strangulation from the electrical cord wrapped around her neck. He stated that it would have taken a minimum of three minutes to produce death by ligature strangulation. He observed no bruising, tears, or rips of the vaginal area and stated that he could not determine whether the flashlight was inserted into the victim's vagina before or after death.

Dr. Harlan testified that based upon his observations as to the general state of the body, the degree of decomposition, as well as an examination of the victim's stomach contents, which were consistent with the victim having recently eaten a taco, he believed that death had occurred within

a two-hour period following the victim's last consumption of food. Assuming that the victim's last meal was the Taco Bell dinner, which she ate between 8:00 and 8:30 p.m., death would have occurred at some point between 8:30 and 10:30 p.m. Dr. Harlan stated that he believed it more likely, based upon his examination of the victim's stomach contents, that death occurred in the first hour of the two-hour period.

Deanie Johnson, a Tennessee Bureau of Investigation (TBI) Crime Laboratory analyst specializing in serology, testified about her participation in the investigation of the victim's death. She said that she determined that semen was present on the vaginal, anal, and oral swabs taken from the victim, indicating that the victim had intercourse in all three areas, although there was less semen on the oral swabs than those from the vaginal and anal areas. She stated that although sperm cells persist for several days in the vaginal cavity, there are fewer cells as time passes. She said that she examined the flashlight and observed a heavy, crusty white stain on the end that had been inserted into the victim's vagina. She observed a large number of sperm cells from this stain. Following her examination, samples were sent to the TBI Laboratory for DNA testing.

Joe Minor, a forensic scientist with the TBI, testified as follows: He received a blood sample from the defendant, anal and vaginal swabs from the victim, the flashlight that had been inserted into the victim, and two tubes of blood obtained from the victim. As to the semen on the flashlight, he determined that its DNA profile matched that of the defendant, who had an extremely rare DNA profile. He testified that there was a 1 in 1.6 billion probability that it could have been someone other than the defendant in the Caucasian population, and a 1 in 114 million probability in the African-American population. As to the semen from the vaginal swabs, he determined that there was a 1 in 2.1 million probability in the Caucasian population and a 1 in 1.2 million probability in the African-American population that it could have come from someone other than the defendant. Moreover, the semen from the victim's vagina and the flashlight came from only one person, that person being the defendant. The swabs from the victim's anal cavity contained an insufficient amount of semen to obtain a DNA profile, and the oral swab from the victim was not submitted to him for analysis. He also received blood samples from Victory Cantrell, Jewell Moses Bess, Danny Burnett, and Brian Blair, but he did not receive these in time to perform analyses prior to his testimony.

Robert James Muehlberger, a forensic document examiner with the United States Postal Inspection Service, testified as an expert witness regarding the handwriting found on the victim's body. He testified as follows: He received handwriting exemplars from the defendant, as well as a photograph of the writing on the victim's body, and he had no doubt that the defendant wrote the words "VICKTORY CANTRELL" on the victim's body. Because there was little distortion of the letter forms, he believed that the victim was lying down when the words were written on her and that she had not moved as the words were being written. He noted that there was no smearing or rubbing of the writing, which would indicate that something had rubbed against it. He did not attempt to identify the substance that was used to write on the victim's body and did not know its smearing capability.

Donnie Roe, an inmate at Brushy Mountain State Penitentiary at the time of his testimony, testified that in January 1996, he was in a holding area at the Rutherford County Courthouse with other inmates, including the defendant, whom he did not know. He stated that the defendant said that the victim was screaming and that he "didn't mean to kill her, that he just wanted to shut her up and he wanted the dope." The defendant also said that he was not apprehended until February. Mr. Roe testified that he informed Detective Spearman about what the defendant said and that Detective Spearman had him write a statement regarding it.

Kimberly Remagen-Straub, who lived in the Colony Square Apartments, testified as follows: She had known the victim for about two years. The victim's apartment was upstairs and one apartment over from her ground-floor apartment. She told investigators about a person she had seen with the victim the Wednesday before the Friday that the victim's body was found, and she assisted law enforcement officers in producing a composite drawing of the person she had seen. On that Wednesday, as she was in the breezeway of her apartment talking to a neighbor, she heard a "muffled scream" between 10:00 and 11:00 p.m. However, in a statement which she had given in 1995, she said that she heard the scream between 7:30 and 8:00 p.m.

Steve Scott, a TBI special agent, testified as follows: His area of expertise was in firearms and tool mark analysis. On January 6, 1995, he was called to the Colony Square Apartments, arriving at approximately 4:15 p.m. He observed that the cord of the victim's telephone had been cut or torn, disabling the telephone. He examined the electrical cord wrapped around the victim's neck and determined that it had been cut. Accordingly, he looked around the apartment to see if the cord had been removed from an appliance. He found a clock radio in the master bedroom with the middle section of the cord removed. He determined that this section of cord was the cord wrapped around the victim's neck.

Sandra Evans, who was employed by the TBI as a special agent/forensic scientist in micro-analysis, testified as follows: On January 6, 1995, she went to the victim's apartment to process the area for relevant evidence. She examined loose buttons found on the floor near the victim with those remaining on the blouse located near her, and she determined that all of the buttons were consistent in color, size, and description. The flashlight was examined for fingerprints, but none of value were found. On cross-examination, she testified that the apartment was vacuumed, as well as examined, for hair. Because the TBI Laboratory does not perform hair analysis, hair samples are normally sent to the FBI crime laboratory. However, two jackets, one of which was denim, found in the apartment were not sent to the FBI Laboratory for analysis. She stated that the TBI did not process the victim's automobile or a blanket that was taken from the master bedroom.

Lieutenant Laura Williams of the Smyrna Police Department testified as follows: She was called to the crime scene and arrived while the victim's body was still on the living room floor. She was not familiar with Victory Cantrell, but after seeing his name written on the victim's body, she obtained a report regarding an incident involving Mr. Cantrell and his wife that occurred two weeks before the victim's body was found. She contacted Mr. Cantrell and asked him to come to the police station for questioning. She told him that his name was involved in a homicide investigation, and

he appeared to be both calm and puzzled. She asked if anyone had a grudge against him, and he told her that he had recently had a run-in with the defendant regarding the defendant's children, who were also Mr. Cantrell's grandchildren.

Lieutenant Williams testified that on January 18, 1995, she and Detective Todd Spearman spoke with the defendant. They advised the defendant of his <u>Miranda</u> rights and told him they were investigating a homicide. The defendant said that he knew the victim as "Sandy" but that he "never really knew her." The defendant told them that he had children with Regina Cantrell, who is the daughter of Victory Cantrell. They asked him to spell Victory Cantrell's name, and, after he said "V-I-C-K," they asked him to write the name Victory Cantrell, as well as other names, for handwriting analysis. When the defendant wrote Victory Cantrell's name, he spelled it correctly, after pausing "for at least a minute between the C and the T." The defendant said that he had gone to the victim's house on Thanksgiving Day with another person to smoke crack cocaine. The defendant denied ever having sexual relations with the victim.

Lieutenant Williams testified that she and Detective Spearman again interviewed the defendant on February 1, 1995. The videotape of the interview was played for the jury. Lieutenant Williams said that following the first interview, she and Detective Spearman discussed the significance of the defendant's misspelling of "Victory" but that she did not ask the defendant about the spelling during the second interview because she overlooked it. She and Detective Spearman saw the defendant a third time on February 13, 1995, pursuant to a search warrant to obtain a blood sample from him. She stated that the defendant was taken to the emergency room so that a sample of his blood could be taken. While the defendant was with the two detectives, he made another statement, which they audiotaped. Because they had not intended to question him this time, they did not have admonition and waiver forms with them. However, the defendant signed a short statement, written by Detective Spearman, saying, "I understand my rights and I am willing to make a statement."

Paul Lamb, the postmaster in Smyrna, testified that the defendant was employed by a contractor who cleaned the post office. Normally, the defendant worked from 7:00 a.m. to 10:30 or 11:00 a.m. However, according to the records to which Mr. Lamb testified, the defendant had worked the morning of January 4 but not on January 5 or 6. The defendant returned to work on Monday, January 9, and was terminated the following day.

Detective Todd Spearman of the Smyrna Police Department testified as follows: When he arrived at the scene, it appeared to him that the victim had been dead for sometime. He spoke with Dr. Harlan at the scene at about 5:00 p.m. and was told that the victim had been dead for approximately forty-eight hours. He found a Taco Bell receipt in the victim's trash and told Dr. Harlan about it. He did not find anything at the scene which would have indicated that Brian Blair had engaged in sexual relations with the victim. Detective Spearman interviewed Mr. Blair and Moses Bess, and it did not appear that Mr. Blair or Mr. Bess were acquainted with Victory Cantrell.

Detective Spearman testified that he was present when the defendant was interviewed the second time, February 1, 1995. The defendant denied ever having sexual relations with the victim. The defendant also denied being at the victim's house other than at Thanksgiving. The defendant stated, "We had took our jackets off, you know, you know, like go behind the chair." Detective Spearman also testified that a man's jacket was found on a chair in the victim's apartment and that a lady's denim jacket was covering it. He again spoke with the defendant on March 7, 1995, which was after the Smyrna Police Department received the result of the preliminary DNA test. After hearing of the DNA results, the defendant admitted having sexual relations with the victim but claimed it was on the Monday before the murder occurred. The defendant said that he had relations with the victim at the same location where her body was found. Detective Spearman testified that although he had not discussed with the defendant the manner in which the victim died, the defendant made certain admissions that the victim's death involved strangulation and a flashlight. Detective Spearman said that when he first began to speak with the defendant on March 7, the defendant said that he had been to the victim's apartment only once, but after talking further, the defendant admitted that he had been there several times. Likewise, the defendant began the interview by saying that he had sexual relations with the victim only once, this occurring on the Monday before the murder, but later stated that he had relations with the victim more than twice. Also, although the defendant started the interview by saying that he had been at home on the evening of the murder, he later stated that he had left his grandparents' house that night to go to the apartment complex where the victim lived.

On cross-examination, Detective Spearman testified that Brian Blair initially told officers that he was at the victim's apartment until 10:00 p.m. on the night of the murder. He said that when Moses Bess was interviewed, officers were aware that Mr. Bess had struck the victim a day or two before the murder. He stated that after the victim's body was discovered, he received an anonymous telephone call from a woman saying that she saw the victim alive the day after officers believed the murder occurred. Detective Spearman said that he followed up on the information and discovered who called, but he ascertained that the information was not correct. He also testified that he learned that Regina Cantrell, who was also known as "Boo" Cantrell, had been in a fight with the victim and had kicked the victim's car. He investigated whether the victim was with Regina Cantrell on the day of the murder.

Carlene Jean Hartley, a friend of the victim, testified as follows: She saw the victim both on New Year's Day, 1995, as well as the following Wednesday, January 4, 1995. The victim and Danny Burnett came to her house on the evening of January 4 between 10:30 and 11:00 p.m., and the victim stayed at her apartment for seven to ten minutes. The victim looked nervous and "rough." The following day, she saw the victim's car being driven by Danny Burnett. After learning of the victim's death, she called the police and left a voice mail message. Detective Spearman returned her call, and they later spoke on several occasions. On cross-examination, Ms. Hartley testified that in the message she left, she may have said that she saw Mr. Burnett and the victim together on Tuesday or Wednesday night before the victim's death.

Moses Bess testified as follows: He and the victim lived together for nine years, beginning in 1987, and had two children together. He did not know if the victim was using cocaine but thought that she was. He never gave her money to buy cocaine. The victim was at his house the entire week before her death, and he had sexual relations with her on January 3, 1995. He called the police the Monday before the victim's death to tell them that she was swerving in her car as she left his driveway. He denied that he had struck the victim. On either January 3 or 4, he spoke on the telephone with the victim and then with Cindy Nowlin. He believed the last time he saw the victim was on January 3, but he did not recall if it was a Monday or Tuesday; however, the last time he saw her was on the same day that he called the police.

Mr. Bess testified that the custody dispute in which he and the victim had been involved regarding their children concluded fifteen months before her death, and they had worked out arrangements for custody, visitation, and child support. He told police that he thought the victim was using food stamps to buy crack cocaine and that when he saw her for the last time, he believed that she was trying to get him to give her money for crack by saying that she wanted an abortion.

Danny Burnett testified as follows: He knew the victim from the Imperial Gardens apartment complex and from Ellen Hickey's house. The victim went to the Imperial Gardens a few times to get crack cocaine, and he used drugs with her once or twice. The victim never told his parents that he was using his father's money to buy drugs, and he never said that he was angry with her. He had ridden in the victim's car a few times but had never driven it. On January 4, 1995, he was released from jail at about 8:15 p.m., and then Fran Fuller drove him to Nashville until about 11:00 p.m. He did not see the victim that day. On January 7 or 8, he was arrested for shoplifting, and after he was released on bond, he went to Florida for a vacation because he knew that he would have to serve time because he had probation violation and bail jumping charges pending. He knew that a bounty hunter was looking for him in the Smyrna area. He called home from Florida and learned that the victim had been murdered.

On cross-examination, Mr. Burnett testified that he was never in the victim's apartment and never had sexual relations with her. He said that he voluntarily gave DNA samples to the police during their investigation.

Ellen Hickey testified as follows: She had lived in the Imperial Gardens Apartments and had known the victim a few months before her death. She knew Regina Cantrell and Danny Burnett because all of them, including the victim, used drugs together. Mr. Burnett lived with her in November and part of December 1994, and he and the victim argued between Christmas and New Year's. Mr. Burnett told her that the victim told his family that he was using drugs and was using money that they had given him for other purposes to buy drugs. Ms. Hickery said that Mr. Burnett threatened to kill the victim and that he disappeared after the victim was murdered.

On cross-examination, Ms. Hickey testified that she knew the defendant but never saw him with the victim. She said that she may have told Detective Spearman that the defendant was the last

person with whom the victim was having an affair. She stated that Mr. Burnett also threatened to kill her and that she and Mr. Burnett were not on good terms at the time of her testimony.

William C. Clark testified as follows: He met the victim on Christmas Eve, 1994, and they drove around together that night. He last saw her the Monday before her death. The victim told him that she was afraid of Danny Burnett because he had threatened her for trying to get money from Mr. Burnett's father. On January 4, 1995, he spent the evening at Ellen Hickey's house, where Regina Cantrell came to take a shower sometime after midnight. He may have smoked marijuana that night. Mr. Clark said that he had known the defendant nearly all of his life and that the defendant was associated with Regina Cantrell, Ellen Hickey, and the victim.

Rita Hamilton testified as follows: She lived at the Colony Square Apartments, and the victim lived directly above her. Although the soundproofing in the apartments was poor, she heard only a radio during the night of January 4, 1995. She recalled only that the victim was with a black male called "Slick." The day that the victim's body was found, the victim's friend, Cindy Nowlin, knocked on Ms. Hamilton's door and asked if she would call the landlord. Ms. Nowlin was in hysterics and repeating, "She told me he was going to do it. I know he done it. She told me if anything happened, that Moses done it."

Dr. Charles Harlan was recalled by the defendant and testified that while the autopsy report did not list a time of death, a competent pathologist could make such a determination from the information in it. He based his opinion as to the time of death upon his examination of the body and its relative state of decomposition and assumed that the meal from Taco Bell had been eaten within one-half hour of its purchase, which was at 7:47 p.m.. He estimated the time of death to be between 9:15 and 9:30 p.m. He further said that in a live female, sperm could be detected in the vagina for up to a maximum of seventy-two hours.

Francis Fuller testified that she knew Danny Burnett but did not know the victim. She said that Mr. Burnett told her that the victim had "fronted" him some drugs and returned later to be paid, but he did not have any money. She stated that the victim told Mr. Burnett that she was going to tell his father what he was doing. She was with Mr. Burnett one night when, upon seeing the victim's car, he said, "There's that bitch. I ought to kill her for what she done." She did not recognize the victim.

Brenda Christopher testified that she lived two miles from the Imperial Gardens Apartments and knew Danny Burnett. She said that two or three days after the victim's body was found, Mr. Burnett came by her residence and asked, while laughing, if she had a flashlight. She told him that the remark was not funny, although she thought he was trying to make a joke. On recross-examination, Ms. Christopher testified that she was not certain that this occurred right after the killing but that it could have been weeks or months afterwards.

Angela Vowell, Carlene Hartley's daughter, testified that her mother telephoned 911 after seeing the story about the victim's death on television. She stated that her mother received four or

five telephone calls from Detective Spearman. On cross-examination, Ms. Vowell said that she did not know why Detective Spearman called her mother or whether it was related to the murder of the victim.

The state called, as a rebuttal witness, Officer Mike Turner, who testified that on January 3, 1995, a man telephoned police and reported that the victim had left his residence and was under the influence of an intoxicant. Officer Turner stated that he then saw the victim's car pull into a market and watched her as she got out of her car. He approached her as she came out of the market and issued a citation to her for driving with a suspended license. He did not arrest her for DUI because he had no basis for doing so.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence was insufficient to sustain his convictions, arguing that all of the evidence against him was circumstantial and not inconsistent with his innocence. The state contends that the evidence was sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). We do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

It is well established that circumstantial evidence alone may be sufficient to support a conviction. State v. Buttrey, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). However, the circumstantial evidence "'must be not only consistent with the guilt of the accused but it must also be inconsistent with his [or her] innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that [the defendant] is the one who committed the crime.'" State v. Tharpe, 726 S.W.2d 896, 900 (Tenn. 1987) (quoting Pruitt v. State, 3 Tenn. Crim. App. 256, 267, 460 S.W.2d 385, 390 (1970)). While following these guidelines, we must note that the jury decides the weight to be given to circumstantial evidence and that "'[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" Marable v. State, 203 Tenn. 440, 452, 313 S.W.2d 451, 457 (1958) (quoting 2 Wharton's Criminal Evidence 1611).

First degree felony murder is, in pertinent part, a "killing of another committed in the perpetration of or attempt to perpetrate any . . . rape." Tenn. Code Ann. § 39-13-202(a)(2). Aggravated rape is, in pertinent part, the "unlawful sexual penetration of a victim by the defendant . . . accompanied by any of the following circumstances: (1) Force or coercion is used to accomplish

the act and the defendant is armed with a weapon or any article used or fashioned in a manner to lead the victim reasonably to believe it to be a weapon; [or] (2) The defendant causes bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(1)-(2).

The evidence viewed in the light most favorable to the state reveals the following: TBI Agent Steve Scott testified as to his observations of the victim's apartment. He testified that the victim's body was on the floor between a coffee table and a couch. The body was unclothed, and a piece of electrical cord was wrapped around the victim's neck. Written on her torso, just below her breasts, were the words "VICKTORY CANTRELL." A blue flashlight was protruding from the victim's vagina. TBI Agent Joe Minor testified that the DNA profile from semen on the flashlight found in the victim's vagina matched that of the defendant, who had an extremely rare DNA profile, and that one person deposited the various DNA samples.

Robert Muehlberger, forensic document examiner with the United States Postal Inspection Service, testified that he compared photographs of the handwriting on the victim's stomach with handwriting exemplars from the defendant and concluded that the defendant had written the words "VICKTORY CANTRELL" on the victim's stomach. Additionally, he testified that the victim was lying down and did not move when the words were written on her. He stated that there was no smearing or rubbing of the writing, which would have occurred if something had rubbed against it.

Cindy Nowlin testified that the victim said she was afraid of the defendant because he wanted to trade crack cocaine in exchange for sexual relations with her and "would not take no for an answer." The victim did not say that she had ever had consensual sex with the defendant. Ms. Nowlin stated that the day of the victim's death, the victim told her that she wanted to stop using cocaine and to straighten out her life and regain custody of her two children. Brian Blair testified that he talked that same day with the victim, who told him that she was depressed about her life and wanted to stop using cocaine. He stated that the victim said that she was afraid of "Regina's boyfriend," whom he later determined to be the defendant.

Lieutenant Laura Williams of the Smyrna Police Department testified that she saw the writing on the victim's torso and that initially the first name appeared to be "V-I-C-K-O-R-Y" but, upon closer inspection, it appeared that someone had inserted a "T" between the "K" and the "O" in the first name, making it "V-I-C-K-T-O-R-Y," a spelling with which she was not familiar. She stated that she then reviewed a police report, showing contact between the Smyrna Police Department and the family of Victory Cantrell on Christmas Day, 1994. She questioned Mr. Cantrell at the police station and told him of the nature of the investigation. When she asked him if anyone had a longstanding grudge against him, he responded that he had had a recent run-in with the defendant. She testified that she interviewed the defendant on January 18, 1995, when he was jailed on another charge, and asked him to spell "Victory Cantrell," which he began to do by saying "V-I-C-K," the spelling of Victory which she had seen only once before, that being on the victim's body.

Donnie Roe, who at the time of his testimony was an inmate at the Brushy Mountain State Penitentiary, testified that he was with other prisoners in a holding area at the Rutherford County

Courthouse in January 1996, and he overheard the defendant state to other prisoners that "he didn't mean to kill her, that he just wanted to shut her up and he wanted the dope, that they didn't catch him up until – it happened like in January, and they didn't catch him until February or something like that, to my knowledge, I believe he said." Mr. Roe testified that he told Detective Spearman of the conversation and that he wrote a statement regarding what he had overheard.

In this case, as in State v. Leming, 3 S.W.3d 7, 13 (Tenn. Crim. App. 1998), the defendant presented evidence suggesting that a third party may have been responsible for the crime. Concluding that the evidence was sufficient to sustain the conviction, the court in Leming noted that "whether other reasonable inferences are excluded by the circumstantial evidence is also a question for the jury." Id. We conclude that, from the above evidence, a rational jury could have found beyond a reasonable doubt that the defendant committed first degree murder and aggravated rape, excluding every reasonable hypothesis except that of guilt. Accordingly, the evidence is sufficient to support the defendant's convictions.

## II. MOTIONS TO SUPPRESS

The defendant made pretrial motions to suppress both his statements to investigating officers and the results of the DNA testing of a blood sample drawn from him which resulted in a match of his DNA with semen found in the victim's vagina and on the flashlight. Because of the relationship between these motions, we will consider them together.

On January 16, 1995, the defendant began serving a sentence for robbery. He was in custody as the result of this conviction at the times he made the statements that he contested in his motions to suppress. He was represented in the robbery case by the public defender's office. He had been represented by attorney Steven Waldron in a previous child custody matter.

Lieutenant Laura Williams and Detective Todd Spearman first questioned the defendant on January 18, 1995, and Lieutenant Williams witnessed the defendant sign a waiver-of-rights form. During the hearing on the motion to suppress, Detective Spearman testified that the first interview of the defendant occurred at the Rutherford County jail and that it was an "investigatory situation." Although this interview was not recorded, Lieutenant Williams later prepared a synopsis of it, which revealed that when the defendant was asked to spell "Victory," as in "Victory Cantrell," the defendant began "V-I C-K" and then corrected himself on the spelling when he was asked to write the name. The defendant also denied ever having any sexual contact with the victim. During the suppression hearing, the defendant testified that he did not read the waiver-of-rights form presented to him and that his rights were not explained to him. He also testified that he twice asked to speak with his lawyer, Steven Waldron.

The two investigators interviewed the defendant a second time on February 1, 1995, at the Rutherford County Workhouse. This statement was recorded by both audio and video means. The defendant again executed a waiver-of-rights form, which was witnessed by both Lieutenant Williams and Detective Spearman. The defendant testified that the officers read his rights to him on this

occasion and that he spoke with them because he had done so the previous time. He said that he did not ask to speak with Steven Waldron because he had spoken with the officers the first time.

The defendant was interviewed for the third time on February 13, 1995. Present at that interview, which was audiotaped, were Detective Spearman, Sergeant Williams, Detective Wiley, and Assistant District Attorney General John Price. The defendant was orally advised of his rights and agreed again to make a statement. The defendant was told that he was a suspect in the death of the victim, and he again denied his guilt. At the time officers went to see the defendant, they already had a search warrant to obtain a blood sample from him and did not anticipate taking a statement from him at the time. He was taken to the Middle Tennessee Medical Center in order that a sample of blood could be drawn. As to this occasion, the defendant testified that he was not given a copy of the search warrant but that he was again advised of his rights and signed a waiver.

On March 7, 1995, the defendant was interviewed a fourth time. The interview was videotaped, and a transcript of that tape shows that the defendant was advised of his rights at the beginning of the interview and that he orally agreed to give another statement as well as sign a waiver of his rights. During this interview, the defendant stated that he had sexual relations with the victim on the Monday before her death. Later, he said that he could have had intercourse with her on Wednesday night "and not even know and left."

During the hearing on his motion to suppress the statements, the defendant testified that as the result of previous arrests, he had been advised of his rights on previous occasions by other officers. He also said that he had had no contact with Steven Waldron since the child custody matter was resolved in Juvenile Court on May 19, 1994. Mr. Waldron testified that he met with a prosecutor and Detective Spearman and told them, in response to being informed that they intended to take the defendant's statement, that he did not represent the defendant. Mr. Waldron stated that one of the days this conversation might have occurred was March 7, 1995, the day the defendant's fourth statement was taken. Mr. Waldron testified that he sent a letter, dated March 31, 1995, to the district attorney general's office, advising them that he represented the defendant. He said that he believed that he was aware that previous statements had been taken from the defendant.

Detective Spearman testified at the suppression hearing that the defendant never said, when any of the four statements were taken, that he wanted a lawyer or that he was then represented by a lawyer. He said that he learned, after the third statement was taken, that the defendant had asked Mr. Waldron to get him moved from the jail to the workhouse. Detective Spearman stated that the officers were never contacted by Mr. Waldron but that he met with him near the time the fourth statement was taken, and Mr. Waldron said that he had not been retained by the defendant.

The trial court made the following findings regarding the defendant's statements at the conclusion of the suppression hearing:

> As far as the statements are concerned, what we're dealing here
> really with is the credibility. As I recall Mr. Turner's testimony, he

-14-

said, well, they never explained it to me. He said, I signed some piece of paper there one time. Well, he wrote out in his own handwriting one time that he understood his rights. There is either an admonition signed by him and waiver or the handwritten thing on the dumb and dumber, as I recall the one, where he wrote that I understand my rights and am willing to make a statement. And I just cannot find that there was any coercion or that his statements were made involuntarily.

The question as to whether or not he was represented by counsel, certainly in the videotaped interview of March the 7th, they went into great detail about that as well as the other admonitions that he signed in each instance. I guess, you know, we might not be here today – there's an old, I believe it's a Biblical saying, the truth will set you free. Had Mr. Turner leveled with the police when they first talked to him, we might have had an entirely different situation. He might have been one of many that they were looking at, but certainly he wouldn't have had the conflicting statements.

The defendant argues that his first statement was not given voluntarily because he was not advised of his constitutional rights. He further argues that his subsequent statements resulted from being misled by the officers, who told him that he was not a suspect and then, later, overstated the evidence connecting him to the crime. Finally, the defendant argues that the statements were obtained after he told the officers that he had an attorney.

The United States Supreme Court, in Miranda v. Arizona, 384 U.S. 436, 479, 86 S. Ct. 1602, 1630 (1966), ruled that law enforcement officers must advise a defendant of the right to remain silent and the right to counsel before a custodial interrogation of the defendant may occur. A waiver of these rights is not effective unless done "voluntarily, knowingly, and intelligently." State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992).

Our supreme court explained in State v. Chalmers, 28 S.W.3d 913 (Tenn. 2000), the applicable law and procedure to be followed in determining the admissibility of a defendant's statement:

It is the duty of the trial judge to determine the voluntariness and the admissibility of the defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1997). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters

-15-

> entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. In addition, "the party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id.

Id. at 928.

We note that at the time of all of the statements made by the defendant, he was being held at the Rutherford County jail as the result of a guilty plea to other charges. Thus, the "in custody" requirement before Miranda warnings must be given may not have been met. See State v. Goss, 995 S.W.2d 617, 629 (Tenn. Crim. App. 1998) (holding that the considerations in making this determination are (1) the language used to summon the inmate; (2) the physical surroundings of the interrogation; (3) the extent to which he is confronted with evidence of his guilt; and (4) the additional pressure exerted to detain the inmate); see also State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996) (holding that the appropriate inquiry to determine whether a person was "in custody" was "whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of movement to a degree associated with a formal arrest").

Because the interrogations occurred while the defendant was confined due to a plea of guilty to an unrelated charge, it is questionable when he was "in custody" so as to require that Miranda warnings be given to him. In any event, the trial court found that the officers did not use coercion while taking the defendant's statements and that the statements were voluntary. Implicit in these findings was that the defendant was advised of his constitutional rights before the taking of the statements, the court noting that the defendant had written that he understood his rights. Furthermore, the trial court found that the defendant was not credible regarding his claim that he told the officers he was represented by an attorney. We conclude that the trial court properly denied the defendant's motion to suppress his statements.

The defendant also contends that the trial court should have suppressed the DNA results. Detective Spearman obtained a search warrant for blood, saliva, and pubic and head hairs from the defendant. Subsequent DNA analysis of the defendant's blood revealed that the defendant's semen was present in the victim's vagina, as well as on the flashlight, which had been inserted into her vagina. The defendant argues that the DNA results should have been suppressed because his blood was obtained by virtue of a fatally defective search warrant, arguing that the search warrant failed to establish probable cause. We note that the defendant complains about the officers obtaining hair samples pursuant to the search warrant. However, the state did not introduce any evidence relating to the hair samples. Accordingly, we are only concerned with the results of analysis on the blood samples.

The affidavit for the search warrant stated as follows:

> I [Todd Spearman] am employed as a detective with the City of Smyrna Police Department and in the course of this employment investigated the death of Sandra L. Coleman.
>
> An autopsy and examination of the body of Sandra Coleman was performed by Doctor Charles Harlan at the office of the State of Tennessee Medical Examiner. I was present during this examination. Body fluids were collected from the body of Sandra L. Coleman and are being held for analysis and comparison.
>
> Affiant makes affidavit that information was received from interviews that were conducted during the course of this investigation that lead the affiant to suspect Lonnie Lee Turner of 106 Johnson St., Smyrna, Tennessee. Affiant also makes oath that Lonnie Lee Turner was involved in a dispute with a Victory Cantrell and attempted to implicate Victory Cantrell in the death of Sandra L. Coleman. Field observations from handwriting samples found at the scene also support Lonnie Lee Turner as a suspect.
>
> Based on this information and statements from interviews, affiant is seeking a search warrant for the body of Lonnie Lee Turner to secure blood, saliva, pubic and head hair from [sic] comparison and analysis by the Tennessee Bureau of Investigation Crime Lab, against those obtained from the body of Sandra L. Coleman.

In ruling on the motion to suppress regarding the search warrant, the trial court stated as follows:

> As far as the search warrant, the search warrant admittedly gives me a little more trouble than the statements. But in giving deference to Judge Buckner's finding of probable cause, I feel that he was satisfied. We're not dealing here with a drug informant as we are in most of our reported cases. We're dealing here with a police official or police detective who has at least been active in the investigation. I feel that that probably obviates the necessity of the description as to the credibility of the witness and so forth, the credibility of the informant.
>
> So I'm going to uphold also the search warrant. However, arguably, I guess you could say what was found as a result of the

> search warrant would still be available to the State today if they
> needed it. So that is my ruling on those two matters.

We agree with the defendant that the affidavit fails to establish probable cause for the taking of blood and body fluid samples from the defendant. The affiant provides no source attribution for the information in the affidavit. Furthermore, the fact that the affiant was a police officer does not validate information received from others who are not identified. Moreover, the affidavit omits one important piece of information, the fact that the name "VICKTORY CANTRELL" was written on the victim's stomach in the defendant's handwriting.

We must now determine the effect of these samples being taken from the defendant without a valid search warrant. The defendant was serving a sentence for robbery at the time the blood sample was taken. Although prisoners do not fall completely outside the sweep of constitutional protections, "imprisonment carries with it the circumscription or loss of many significant rights." Hudson v. Palmer, 468 U.S. 517, 525-24, 104 S. Ct. 3194, 3199 (1984); Bell v. Wolfish, 441 U.S. 520, 545-46; 99 S. Ct. 1861, 1877 (1979). Because they are incarcerated, prisoners have a diminished expectation of privacy. See Hudson, 468 U.S. at 526-27, 104 S. Ct. at 3200 (holding that prisoners have no expectation of privacy in their jail cells); Bell, 441 U.S. at 560, 99 S. Ct. at 1885 (holding that pretrial detainees can be subject to body cavity searches following contact visits without a warrant or probable cause); see also State v. Dulsworth, 781 S.W.2d 277, 284 (Tenn. Crim. App. 1989) (noting that a prisoner has no legitimate expectation of privacy in his or her jail cell). Moreover, the collection of a blood sample is a minimal intrusion and has become routine. Schmerber v. California, 384 U.S. 757, 771, 86 S. Ct. 1826, 1836 (1966). Thus, the warrantless collection of a prisoner's blood sample for the purpose of adding information to a DNA database does not violate the Fourth Amendment. Jones v. Murray, 962 F.2d 302, 307-08 (4th Cir. 1992) (holding that the state's interest in identifying prisoners for improved law enforcement outweighed the minimal intrusion of taking a blood sample); People v. King, 99 Cal. Rptr. 2d 220, 226-27 (Cal. Ct. App. 2000) (holding that DNA profiling, which led to the defendant's convictions in the present case, did not violate the Fourth Amendment); Cooper v. Gammon, 943 S.W.2d 699, 705 (Mo. Ct. App. 1997) (holding that the collection of a prisoner's blood sample for DNA profiling is constitutional because of the prisoners' reduced expectation of privacy, the minimal intrusiveness of a blood test, the great public interest in deterrence of recidivists and accurate verdicts). Furthermore, one jurisdiction has reasoned that an inmate's reduced expectation of privacy permits the warrantless collection of a blood sample for use in a pending murder investigation. Brown v. State, 493 So. 2d 80, 81 (Fla. Dist. Ct. App. 1986) (concluding that prison officials reasonably believed that the defendant stabbed his fellow inmate based upon an eyewitness account); see also Vera v. State, 400 So. 2d 1008, 1009 (Fla. Dist. Ct. App. 1981) (holding that due to the prisoner's reduced expectation of privacy and the exigencies of the prison setting, officials did not need a warrant or probable cause to conduct a body cavity search of an inmate following a tip that the inmate was concealing contraband).

In the present case, the officers had probable cause to believe that the defendant had killed the victim. Victory Cantrell told Lieutenant Laura Williams that he was in a recent dispute with the

defendant. Officers found the name "VICKTORY CANTRELL" written on the victim's stomach in the defendant's handwriting. When asked to spell Victory Cantrell, the defendant began with "V-I-C-K." The defendant also told the officers that when he visited the victim on Thanksgiving of the previous year, he and the victim had placed their jackets behind a chair. Detective Spearman testified that he found two jackets at the crime scene, a lady's jacket over a man's jacket on the back of a chair. In light of the defendant's diminished expectation of privacy as an inmate and the presence of probable cause, we conclude that the admission of the DNA results into evidence was proper.

### III. CLAIMS AS TO VIOLATIONS OF DUE PROCESS, COMPULSORY PROCESS, CONFRONTATION, AND THE RIGHT TO PRESENT A DEFENSE

The defendant presents a number of arguments within this issue. We will address each argument separately.

### A. Proof that the District Attorney Acknowledged that the Defendant Was Not Guilty

The defendant was indicted on October 10, 1996. However, according to Steve Waldron's testimony at a pretrial motion hearing, an assistant district attorney general, who was involved in the investigation and prosecution, told him in March 1995 that "they had the wrong man" and that "Lonnie Turner was not the man who killed Ms. Coleman." The defendant claims that this statement was admissible pursuant to Tennessee Rule of Evidence 803(1.2), which states as follows:

> **Admission by Party-Opponent.** A statement offered against a party that is (A) the party's own statement in either an individual or a representative capacity, or (B) a statement in which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by an agent or servant concerning a matter within the scope of the agency or employment made during the existence of the relationship under circumstances qualifying the statement as one against the declarant's interest regardless of declarant's availability, or (E) a statement by a co-conspirator of a party during the course of and in furtherance of the conspiracy, or (F) a statement by a person in privity of estate with the party. An admission is not excluded merely because the statement is in the form of an opinion. Statements admissible under this exception are not conclusive.

The trial court ruled that the assistant district attorney's statement was inadmissible, stating, "And I think his opinion early on in the case would be completely immaterial. If it was after the indictment, I'd let you bring it in, but three months prior to the indictment, no."

When the defense argued at trial that the statement should be admitted, the court affirmed its previous ruling that the statement was inadmissible, stating that

> had Mr. Price made this statement after the grand jury indicted Mr. Turner, it would have been an admission against his party, the State. At the time I do not think it was. I think it was merely an opinion, and I would hope, if he still felt that way, that we wouldn't be prosecuting this case or that the State would not be prosecuting this case. So I'm going to rule out Mr. Waldron's testimony.

We review the decision of the trial court not to admit the evidence of the statement for an abuse of discretion. State v. Gilliland, 22 S.W.3d 266, 271 (Tenn. 2000). While there is authority that a prosecutor's statement in the trial of a co-conspirator is admissible in a subsequent trial, United States v. Bakshinian, 65 F. Supp. 2d 1104, 1110-11 (C.D. Cal. 1999), such a statement may still be inadmissible if "the likelihood of confusion and waste of time outweighs the probative value of the statement." Id. at 1110. Here, we conclude that, especially given the timing of the alleged statement of the prosecutor, it would have been inadmissible under Rules 402 and 403, Tenn. R. Evid., even if it could have been considered as an admission by a party-opponent. Accordingly, we cannot conclude that the trial court erred in not admitting the statement.

Although the trial court commented that the statement would have been admissible if it had been made after the defendant was indicted, that was not the case. Accordingly, it is unnecessary for us to determine whether this is a correct statement of the law.

## B. Bill of Particulars

The defendant argues that the trial court erred in not requiring the state to provide a bill of particulars stating the exact time and place of the offense, the specific means by which it was committed, a description of weapons or instrumentalities used, whether the defendant was a principal or an aider and abettor, the precise manner in which the crime was committed, the precise manner in which the defendant allegedly participated, the name and address of each and every person who participated in the criminal acts, and the names and addresses of each person having knowledge of the facts charged in the indictment. The state argues that the defendant waived consideration of this issue by failing to obtain a ruling, written or oral, on his motion for a bill of particulars. The state further argues that the defendant was provided with much of the additional information sought and that the defendant was not entitled to the remainder of the information, given the narrow nature of a bill of particulars.

The transcript of the hearing on the defendant's motion for a bill of particulars reveals that during the hearing, the state advised the trial court that much of the information requested was provided to defense counsel in other pleadings and records. The record does not reveal that the defendant actually sought or that an order was entered as to the requests set out in the motion for a bill of particulars. However, considering the statements of counsel during the hearing on the motion,

-20-

the record reflects that much of the requested information was provided to defense counsel, in one form or another, although not always in the detail requested. As to the time of the victim's death, the state submitted in its written demand for notice of alibi that it occurred "between the hours of 12:01 a.m. January 4th, 1995 and 2:30 p.m. January 6th, 1995." During the hearing, oral responses were made by the state to the requests regarding the location of the offense, the means and weapon used, the manner in which the defendant participated, and the identity of persons having knowledge of the homicide. The defendant did not deny that he received the records, as claimed by the state. Likewise, the defendant did not complain about the additional oral responses made by the state during the hearing regarding the discovery requests. Furthermore, the defendant did not request an additional response in writing or ask that an order be entered regarding the matter, which was not discussed again by the parties.

It was certainly proper for the defendant to move for a bill of particulars to obtain additional information about the state's case. State v. Hammonds, 30 S.W.3d 294, 303 (Tenn. 2000). Although the state orally responded during the hearing, there is no ruling which we can consider in determining whether the trial court abused its discretion because no order was entered on the motion. See T.R.A.P. 36(a). In any event, given the nature of the information sought, the oral responses of the state during the hearing on the motion, and the fact that no showing has been made that the defendant was not "fully apprised of and given access to all discoverable information" or that the defendant was "prejudiced in the preparation of his defense," State v. Stephenson, 878 S.W.2d 530, 539 (Tenn. 1994), we cannot conclude that the trial court erred regarding the bill of particulars.

## C.  State's Pretrial Pleadings

The defendant argues that two of the pleadings filed by the state should have been admitted into evidence and passed to the jury. These consist of (1) a memorandum prepared by the state to memorialize a meeting attended by both counsel and the trial court and (2) the state's demand for notice of alibi pursuant to Rule 12.1(a) that included a time, date, and place of the offense.

During the in camera conference attended by the trial judge, counsel, the defendant, the defendant's investigator, and Detective Todd Spearman, the defendant's second discovery motion, which sought information as to other persons who had been with the victim "after 6:00 p.m. on Wednesday, 1/4/95, or at any time on 1/5/95," was discussed. In response to this request, the state prepared a memorandum which stated that "Brian Blair had stated to detectives that he was in Coleman's company on 1-4-95 from approximately 7:00 p.m. until 10:00 p.m."

During Brian Blair's testimony at the trial, he said that he arrived at the victim's apartment at 7:00 p.m. on January 4, 1995, and left at about 9:00 or 9:30 p.m. He was not questioned by defense counsel as to the statement in the memorandum that he had told detectives that he was with the victim until 10:00 p.m. However, when Detective Spearman later testified, defense counsel attempted to introduce the state's memorandum, asserting that it was a Tennessee Rule of Evidence 803(1.2) admission by a party-opponent. Explaining his purpose, defense counsel stated:

If your Honor please, what we were trying to get at here is to impeach Mr. Blair's testimony that he was there from [sic] 9:00 to 9:30 by showing the admission the prosecution filed in the record that[ ] he's told them that Blair stated to detective he was in Coleman's company 1/4/95, from approximately 7:00 until 10:00 p.m. And that's my purpose.

The state argues that if the defendant wanted to impeach Mr. Blair with this prior inconsistent statement, the proper way to do so was to recall Mr. Blair and question him about it. The state contends that because Mr. Blair was not a party to the case, he could not be deemed the state's agent for the purpose of a Rule 803(1.2)(C) or (D) admission. Additionally, the state argues that Tennessee Rule of Evidence 613(b) does not permit extrinsic proof of a prior inconsistent statement unless the maker of the statement has first been given the opportunity to explain or deny the statement.

In State v. Martin, 964 S.W.2d 564, 567 (Tenn. 1998), our supreme court explained the procedure for placing prior inconsistent statements before the jury. The court held that under Rule 613, Tenn. R. Evid., extrinsic evidence of a witness' prior inconsistent statement "remains inadmissible until: (1) the witness is asked whether the witness made the prior inconsistent statement; and (2) the witness denies or equivocates as to having made the prior inconsistent statement." Id. ("This [traditional] practice required that a witness' attention be drawn to the place, persons present, time of the statement, and to the substance of the statement before extrinsic evidence of the prior inconsistent statement could be used to impeach the witness' credibility.").

In this case, the defendant ignores the requirement that the witness first be confronted with the statement in order that the witness could respond. Instead, the defendant argues that a memorandum setting out an apparently prior inconsistent statement is an admission of a party-opponent. We note that the Memorandum of In Camera Disclosure, to which the defendant points as an admission of a party-opponent, sets out: "Brian Blair had stated to detectives that he was in Coleman's company on 1-4-95 from approximately 7:00 p.m. until 10:00 p.m." Although the memorandum reflects that Detective Spearman attended the conference with the trial judge, it does not state that he was one of the "detectives" to whom Brian Blair made the statement.

We agree with the state that the proper procedure for the defense to use the prior statement of Brian Blair was to cross-examine him about it, either while he was on the witness stand or by recalling him. The procedures of Rule 613 and the holding in Martin cannot be short-circuited by taking an allegedly prior inconsistent statement of a witness, recasting it as an admission of a party-opponent simply because it was made to a police officer rather than to another witness, and then seeking to have the statement admitted through an opposing witness who may not have been present when it was made. We conclude that the trial court did not err in preventing the defendant from introducing the memorandum into evidence during Detective Spearman's testimony.

The defendant also complains about the notice regarding the time of death filed by the state. As we have previously set out, the state filed a Rule 12.1 notice setting out the time, date, and place of the offense. According to this notice, the offense occurred "between the hours of 12:01 a.m. January 4th, 1995 and 2:30 p.m. January 6th, 1995." As the defendant cross-examined Lieutenant Laura Williams regarding her belief that the victim's death occurred on the evening of January 4, 1995, he attempted to question her as to the statement in the state's notice that it had occurred during the period from January 4 to January 6. However, after an objection by the state, and during a bench conference, it was ascertained that the witness did not know why the state had alleged that the victim's death occurred during this period. The defendant was then allowed to ask the witness, in the presence of the jury, if she knew why the state had contended that the death occurred during the period from January 4 to January 6. She responded that she did not. After the state asked the court to explain the purpose of such a notice, the court then read the notice to the jury and explained that the notice was prepared "to give the defense an opportunity to explore alibi if they wished to for that period of time," and marked the notice as Exhibit 53. The defendant did not object to this procedure.

Later in the trial, Detective Todd Spearman testified that Dr. Harlan told him that food in the victim's stomach at the time of the autopsy had been there for "an hour and a half to two hours" before her death. The defendant objected following the question and answer, and a bench conference was held, after which the court instructed the jury to strike the detective's answer to the last question and to "make your own decision about what the detective was told [by Dr. Harlan]." The defendant now links these events to argue that "[t]he Court allowed the State to introduce this hearsay testimony . . . which, in effect, contradicted its own witness by prior out-of-court statements." He further argues that at the same time, the court refused to allow the defense to introduce as an exhibit the very pleadings in which the state said that death occurred at a different time and at a time when someone other than the accused was present with the victim. The record does not support this argument. The state's Rule 12.1 notice was marked as an exhibit and read to the jury. Additionally, the jury was instructed to disregard Detective Spearman's statement as to what he was told about the time of death by Dr. Harlan. This issue is without merit.

### D. Motion for Mistrial

At the conclusion of the proof, the defendant moved for a mistrial, stating that he had been "denied a fair trial under the due process, compulsory process, and right to present a defense under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, Sections 7, 8, and 9 of the Tennessee Constitution." The defendant made this motion without specifying the court's rulings to which he was objecting. Accordingly, we are not able to consider this "catchall" motion which does not specify the trial court rulings to which he objects.

In any event, it is within the sound discretion of the trial court whether to grant a mistrial. State v. McKinney, 929 S.W.2d 404, 405 (Tenn. Crim. App. 1996). We will not disturb the trial court's ruling in this regard absent an abuse of discretion. State v. Adkins, 786 S.W.2d 642, 644 (Tenn. 1990). In this case, we cannot conclude that the trial court abused its discretion in denying the defendant's motion for a mistrial.

## IV. EXCLUSION OF TESTIMONY OF DEFENSE WITNESSES

The defendant presents a number of arguments within this issue. We will address each argument separately.

### A. Required Jury-Out Hearings Before Cross-Examination

The defendant contends that the trial court took the unprecedented action of compelling him to submit each of his witnesses in advance to jury-out examination by the state in order for the court to determine if the testimony would be admissible. The defendant complains that this practice allowed the state to discover the nature of the witnesses' testimony before the witnesses testified.

Initially, we note that the in-chambers questioning of witnesses began as the state was presenting its case. During the cross-examination of Brian Blair, the jury was excused and the defendant questioned Mr. Blair in chambers about a statement which he had given to investigating officers. Additionally, when the state objected as the defendant cross-examined Kimberly Remagen-Straub about the victim's sexual involvement with Slick Drennon, the trial court excused the jury and allowed the cross-examination to continue out of the jury's presence. The state asked that the defendant adhere to the court's prior ruling that questions about alternative perpetrators not be asked until a jury-out hearing had first been held.

After the state was preparing to rest its case, the parties discussed having in-chambers testimony of certain defense witnesses, and the court stated:

> THE COURT: I've said this until I'm blue in the face. I'm not interested in what their testimony is going to be. I am interested in how they came by the knowledge that they got.
>
> MR. DANIEL: I think that's the legitimate area of inquiry, not whether or not – you know, they've made all sorts of statements of people who have given different statements at one time or another. And the fact that they may say, well, didn't you say this at such and such time, doesn't have anything to did [sic] with whether or not they're saying it at this time, but it's different. That's just like they did Mr. Moses.
>
> THE COURT: Okay. That to me is the threshold question, not what they know, but how they know it.
>
> . . . .
>
> GEN. PRICE: I'll be glad to let the Court examine them if Mr. Daniel thinks I'm –

MR. DANIEL: Well, no. The point I'm trying to make is, my witnesses should not be subjected to rules that haven't applied to the other side. They don't have a right to discover my witnesses, just to come in and ask them. If they're going to ask questions of something, it needs to be do you have information.

THE COURT: And how did you get that information.

GEN. PRICE: That's exactly what I'm saying.

THE COURT: That's all we're talking about.

MR. DANIEL: If they say they want to impeach them or don't like their answers, they can do whatever they want in the courtroom.

The trial court held a hearing at which Will J. Marable, Jimmy R. Moss, Danny Ray Burnett, Raymond Miles, William C. Clark, and Carlene Jean Hartley were asked questions, first by defense counsel and then by the state. Mr. Marable and Mr. Moss both testified that they had been confined in the prisoner holding area in the Rutherford County Courthouse on January 6, 1996. Both stated at the hearing that they did not hear the defendant make any statement regarding the murder of the victim. Neither of these witnesses subsequently were called by the defense to testify before the jury.

Mr. Burnett, who was then an inmate at the South Central Correctional Facility, denied having any knowledge of the victim's alleged conversation with his father that he was using drugs or saying that he would "get" the victim for doing so. He denied that he ever drove the victim's car or that he saw her on January 4 or 5, 1995. He also denied that he made comments to others about a flashlight, apparently referring to the victim's death. Finally, in response to the defendant's continuing questions, Mr. Burnett said that he would answer no further questions, complaining that he had been harassed, dragged back and forth from the penitentiary, and missed his job and school. However, Mr. Burnett was later called as a defense witness and testified at length before the jury.

William C. Clark also testified during this out-of-court hearing. He was asked questions first by defense counsel and then by the state. Later, just before he was called to testify before the jury, he was again questioned in chambers, this time only by the court. Mr. Clark then testified before the jury.

Raymond Miles, another potential defense witness, also testified in chambers before being called to testify before the jury. Before he was questioned in chambers, the state said that its position was that Mr. Miles had no relevant information. He was questioned first by the defendant and then by the state but was not called to testify before the jury.

Based upon the questions asked of these witnesses, first by the defendant and then by the state, we believe that the jury-out hearings were intended to determine, before the witnesses' in-court

testimony, how much, if any, admissible knowledge each witness had. We note that the defendant ultimately did not call Mr. Marable, Mr. Moss, or Mr. Miles to testify before the jury. Mr. Burnett and Mr. Clark both testified as defense witnesses. The defendant has made no showing, and we cannot conclude, that the procedure followed with these witnesses was detrimental to the defense.

Although it is not entirely clear from the extensive record in this matter why certain defense witnesses testified in the judge's chambers before testifying before the jury, we infer that this procedure resulted from the court's ruling in response to a state's motion in limine. The motion requested that defense witnesses not be allowed to testify (or that such questions be asked of any defense witness) as to a person other than the defendant who may have killed the victim without first having an offer of proof in this regard out of the presence of the jury. The oral ruling of the trial court regarding this request, to which the parties agreed, was that such hearings would be held on an "individual basis." We have carefully reviewed the in-chambers testimony of these witnesses, and the purpose of the questions was to determine the admissibility of certain anticipated testimony. Following the in camera testimony, the defendant elected not to call several of the witnesses before the jury. As for the remaining witnesses, we cannot conclude, based upon the subsequent testimony of these witnesses before the jury, that the defendant was prejudiced by the procedure about which he now complains.

### B. Carlene Hartley

The defendant argues that the prosecution violated his right to due process by introducing collateral matters of alleged misconduct of his witness, Carlene Hartley, and by badgering her about these matters. The defendant contends that the court committed prejudicial and reversible errors in allowing the state to badger and unfairly abuse Ms. Hartley in a way which intimidated her and went beyond the bounds of normal advocacy. The defendant refers to several statements made by the state to Ms. Hartley during cross-examination. Additionally, the defendant argues that the trial court erred in allowing the state to impeach Ms. Hartley improperly by showing that she spent thirty-six days in jail for a misdemeanor assault that occurred ten months after the victim's death.

We have reviewed the questions and answers of Carlene Hartley, and while some of the questions asked by the state border on being either argumentative or comments rather than questions, we conclude that none affected the substantial rights of the defendant. State v. Blevins, 968 S.W.2d 888, 894 (Tenn. Crim. App. 1997). As to Ms. Hartley testifying about time that she spent in jail, we note that she volunteered the information after being asked how she remembered the exact day she had discussed her testimony with defense counsel:

> Q. And you remember specifically that it was November the 4th that you talked to Mr. Daniel, and why is it you remember that day?
>
> A. Because I had to take care of being in trouble a couple of years ago stemming from Laura Williams and what had happened, and that's when I went to jail and took care of that.

Q. So you went into jail that day[?]

A. That night.

The defendant argues that in questioning this witness, the state implied that defense counsel was unethical and that it accused Ms. Hartley of bail jumping and aggravated child abuse. The record does not support this claim. After Ms. Hartley testified that she had been in trouble, the state asked if she had been convicted of simple assault, and then she volunteered that she had gone to jail for thirty-six days for this offense.

We note that much of the cross-examination of Ms. Hartley questioned her reasons for leaving Tennessee after the victim's death. During this cross-examination and in response to the state's question as to whether the victim associated with the defendant, Ms. Hartley said that the victim told her that she had sexual relations with the defendant a day or so before her death. Ms. Hartley had not testified about this statement during direct examination.

No objections were made by the defendant during much of the testimony of Ms. Hartley. We do not believe that the trial court abused its discretion in allowing the prosecution to cross-examine Ms. Hartley as it did.

### C. Moses Bess

The defendant makes several arguments regarding Moses Bess, who fathered two children with the victim. He argues that he should have been allowed to show the nature of the sexual practices in which Mr. Bess and the victim had engaged, specifically practices such as insertion of foreign objects into the body and oral and anal sex. Additionally, he argues that he should have been allowed to cross-examine Mr. Bess as a hostile witness regarding matters which were not included in the audiotape of Mr. Bess's statement and that it was error to allow Mr. Bess to review a copy of his statement when the court took a recess during a break in his testimony.

Mr. Bess was called by the defendant and subjected to direct, cross, and redirect examination. Mr. Bess had given a statement on audiotape to police officers, and the state and the defendant independently had transcripts prepared of the audiotaped statement. However, the transcripts did not agree with what Mr. Bess had said. Also, after Mr. Bess's testimony, the defendant was given another copy of the audiotape. This second tape was of better audio quality than the one previously furnished to the defendant.

We note that although the record shows that the parties argued extensively before the trial court regarding Moses Bess's prior statement, which was recorded and from which transcripts were prepared, none of the versions of either the tapes or the transcripts are part of the record on appeal. Thus, we are limited in our review of this issue. Regarding the statement of Moses Bess, the parties argued:

GEN. PRICE: Your Honor, there is nothing time specific about this statement. This man has testified that he had sex with [the victim] on Monday and on Tuesday and that he used a condom. What is the purpose of this line of questioning? Are you disagreeing with it?

MR. DANIEL: To show that the sexual practices – part of it is to show that the sexual practices that were found or noted here were ones that would be engaged in by this victim and even engaged in with her husband.

GEN. PRICE: Which means?

MR. DANIEL: Which means that the semen found in her is not something that would be unusual or evidence of any type of rape or improper forced sex, but was simply something that she would engage in as a matter of course.

THE COURT: The only thing I can see that it shows is it might show a reason for the exclusion of any semen of Moses Bess in her system.

Following arguments regarding the admissibility of the victim's prior sexual practices with Mr. Bess, the trial court stated that "[w]hat she did with the fellow she lived with for eight years is certainly no consequence of somebody that she had limited contact with." Because neither the transcript nor the audiotape of the statement of Moses Bess was made a part of the appellate record, the only record we have of it comes from the argument of counsel. The state argues that this issue was not properly preserved for appeal because the defense failed to make a proffer of the statement of Moses Bess.

We note that Mr. Bess testified on direct examination that he had sex with the victim the Monday before her death. Because he thought she might have been going out with other men during the period just before her death, he used condoms when he had relations with her. Mr. Bess testified during redirect examination by the defendant that he had sexual relations with the victim the Tuesday before her death and probably that Monday too. Also, according to defense counsel's reading of Mr. Bess's statement to the court, Mr. Bess was asked about any peculiar sexual practice that the victim desired, and he responded, "Oh, she liked to be ate."

The defendant argues that he was entitled to determine whether the victim customarily would engage in sexual practices such as those which the state used as its evidence in the case, i.e., insertion of foreign objects into the body and oral and anal sex. The defendant has not cited any part of the record which suggests that there is a basis for making such a supposition. We note that at the conclusion of the proof, the state elected to proceed as to Count III of the indictment, charging aggravated rape committed by vaginal penetration by the flashlight. Thus, the factual situation

-28-

presented here is unlike that of State v. Brown, 29 S.W.3d 427, 434 (Tenn. 2000), in which our supreme court concluded that the rape shield law, Tennessee Rule of Evidence 412, did not prevent the introduction of reliable hearsay to explain how the victim's hymenal injury could have occurred other than by having relations with the defendant. In that case, the court concluded that the defendant's "constitutional right to present a defense was violated by exclusion of the proffered hearsay evidence." Id. at 435.

In the present case, even though not specifically discussed by the attorneys or the trial court, we conclude that the rape shield law prevented the defendant from embarking on a "fishing expedition" as to the victim's sexual practices. The fact that the victim died does not affect the application of Rule 412. See State v. Clowney, 690 A.2d 612, 619 (N.J. Super. Ct. App. Div. 1997) (applying the New Jersey rape shield law and stating, "We find nothing in the language of the statute, or its underlying purposes, to suggest a deceased victim's prior sexual conduct is less protected than a living victim's").

Rule 412, Tenn. R. Evid., provides that evidence of specific incidents of a sex offense victim's sexual behavior with persons other than the accused is inadmissible unless it is offered to rebut or explain scientific or medical evidence or to prove or explain the source of semen, injury, disease, or knowledge of sexual matters and the probative value of the evidence outweighs its prejudicial value to the victim. The defendant argues that the trial court should have allowed this evidence because Dr. Harlan testified that there was no bruising of the vagina or anus, yet the state was arguing that there was some type of violent sexual penetration involved in the use of the flashlight and the presence of semen in the mouth and anus. Thus, he argues, it was critical for him to show these acts were not unusual for the victim and were not evidence of violence during sex but rather that the death more likely occurred after sex. The defendant argues that the victim's sexual acts with Mr. Bess were evidence of her customary practices or that the actual perpetrator was a person who had engaged in such acts with the victim in the past, i.e. her husband, Moses Bess.

We agree with the state that it is difficult for us to rule on the assignments of error relating to the statement of Moses Bess because the statement is not a part of the record on appeal and our knowledge of it is limited to selected portions of the statement which were quoted during arguments as to its admissibility. See State v. Goad, 707 S.W.2d 846, 852-53 (Tenn. 1986). We note that the defendant did not comply with Rule 412 procedures, a matter about which the state informed the trial court. In any event, based upon the quoted portion of Mr. Bess's statement, we cannot conclude that the trial court erred in ruling that the information regarding the victim's prior sexual activity was not relevant. Additionally, it appears that this information did not support the defendant's attempt to explain how the victim might have had semen in her mouth and anus absent being raped. The explanation from the defendant was pure speculation. The record contains no proof that the victim had engaged in the sort of consensual sexual activity about which the defendant wanted to question Mr. Bess. In doing so, the defendant would have been engaging in a "fishing expedition."

The defendant also argues that because he was furnished with a lesser quality audiotape of Mr. Bess's statement than the state had and was given an incomplete version of the transcript of the

statement, the trial court erred in not allowing him to treat Mr. Bess as a hostile witness. We are unable to rule on this claim because the record does not contain the audiotapes or the allegedly differing transcripts. Accordingly, this issue is waived.

As to the defendant's claim that he should have been allowed to cross-examine Moses Bess as a hostile witness concerning matters which Mr. Bess stated to police but which were not contained in the audiotape that was originally furnished to the defendant, we agree with the state that this issue is waived because neither the audiotape nor the transcript were made a part of the record. In any event, the record shows that the defendant was allowed to question Mr. Bess at length regarding the statement. We note that Mr. Bess was called by the defendant and subjected to direct and cross-examination just before the trial adjourned for a weekend. The redirect examination, which began on Friday, continued the following Monday. During the redirect examination, the defendant questioned Mr. Bess about statements he made to law enforcement officers. The state objected to certain questions about statements appearing in the defendant's transcript because the questions were beyond the scope of the earlier cross-examination. The record reveals that defense counsel was given leeway in his redirect examination of Mr. Bess, with the trial court overruling a number of the state's objections that the questions were beyond the scope of the cross-examination. The specific instance cited by the defendant involved the trial court sustaining an objection to the following: Defense counsel asked Mr. Bess, "Do you know where she was getting her crack?" and then, apparently reading from Mr. Bess's statement, continued, "You never heard her mention any names? 'There was a guy named James out of Nashville, and she was getting some from Larry and Wanda.'" The trial court then ruled that the question was beyond the scope of the cross-examination and instructed counsel to "move on." The scope of redirect examination is within the discretion of the trial court and will not be disturbed unless there has been an abuse of discretion. State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999). We conclude that the trial court did not abuse its discretion in this regard.

### D. Quality of Audiotapes Given to the Defendant

The defendant complains that his copies of the audiotapes of witnesses' statements were of lesser quality than those tapes possessed by the state and that the state refused to provide him transcripts which it had prepared from the tapes. However, these witnesses were not identified, and neither the tapes nor the transcripts were made a part of the record. Accordingly, this issue was not preserved for appeal. Additionally, the defendant has not shown how this affected the trial. This issue is without merit.

### E. Multiple Prosecutors Arguing on the Same Point

The defendant claims that the trial court should not have allowed more than one prosecutor to argue on a particular point. His only citation to this occurring was an objection made by defense counsel during an out-of-court hearing following the cross-examination of Carlene Hartley. The trial court's response was that it was "not letting them all cross-examine the witnesses, only one at a

time." We note, as the trial court suggested, that Ms. Hartley was cross-examined by a single prosecutor. We see no error in the record before us.

### F. Exclusion of Testimony Regarding the Victim's Association with Slick Drennon

The defendant claims that he should have been allowed to put before the jury the jury-out testimony of Kimberly Remagen-Straub that Slick Drennon was a drug dealer who had been to the victim's apartment "probably a couple of days" before the victim's body was found, that the victim had sexual relations with him at some point, and that everyone at the apartment complex feared him. During a jury-out hearing, Ms. Remagen-Straub testified that she saw Mr. Drennon at the victim's apartment door at least two weeks before the victim's death, that the victim had sexual relations with Mr. Drennon, and that the victim got drugs from him. The trial court ruled that this evidence was not admissible, and it sustained the state's objection because the witness was "not sure. She doesn't remember exactly when it was. It could have been two weeks before. It might have been a month before. When she testified that she had had sex with Mr. Drennon, she doesn't know whether she was referring to the night before or six months before." Based upon its content, nature, and uncertainty, we cannot say that the trial court erred in not allowing this testimony. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

### G. Testimony Regarding Drug Paraphernalia Found in the Victim's Apartment

The defendant complains that it was error for the trial court not to allow him to question TBI Agent Sandra Evans about drug paraphernalia found in the victim's apartment after the homicide. The defendant complains that this ruling prevented him from showing that the death very likely resulted from an encounter with a drug user and dealer, such as Slick Drennon. The defendant argues that he has the constitutional right to put the evidence and testimony into context to show that it was consistent with the victim dealing in drugs, using drugs, and a drug dealer coming there for the purpose of killing the victim, perhaps because of a dispute over payment for the drugs.

The witness immediately preceding Sandra Evans was TBI Agent Steve Scott, who gave the following testimony regarding drug paraphernalia during cross-examination by defense counsel:

> Q. Now, with regard to the items found, did you seize or analyze what was called drug paraphernalia?
>
> A. There was some drug paraphernalia retrieved from the adult bedroom at the house. I did not do the analysis on that.
>
> Q. Can you describe what that drug paraphernalia was?
>
> A. I have no recollection whatsoever of that. It was found by another examiner. I believe it was found by Ms. Evans, and she noted

-31-

that in her notes. It is listed on our form. It was submitted for analysis.

Following the testimony of Agent Scott, the state made a motion in limine that the defendant not be allowed to introduce proof regarding the drug paraphernalia because there was no residue found and because the evidence was irrelevant character evidence because no drugs were in the victim's system at the time of death. During the in camera questioning of Sandra Evans before she testified in front of the jury, she told defense counsel that although she found drug paraphernalia in the victim's apartment, she could not remember exactly what it was. She said that the "descriptive ID" of the drug paraphernalia was prepared by Kathy Carmen at the TBI laboratory. According to Ms. Carmen's notes, read by Ms. Evans, "some residue" was removed "from a homemade pipe," and the other evidence "contained insufficient or no material for analysis." Responding to a question from the defendant regarding the analysis of the residue on the pipe, Ms. Evans stated that "these are questions you will have to ask Kathy Carmen more specifically. I'm just reading her notes, and that's as far as I can go." Accordingly, in ruling that the defendant would have to call Ms. Carmen to testify about this evidence, the trial court stated, "I don't think there's anything that this witness knows about any drug paraphernalia. I've left the door open for you to get it in if you want to, but not through this witness."

We note that evidence that drug paraphernalia was found in the victim's apartment was presented to the jury. The record does not show that the defendant subsequently made an attempt to call Kathy Carmen as a witness. Thus, even if the trial court erred in not permitting Sandra Evans to testify from notes made by another TBI agent as to the specific drug paraphernalia found, this error was harmless. See T.R.A.P. 36(b).

## H. Testimony Regarding Other Suspects

The defendant contends that portions of Detective Spearman's direct examination testimony were improperly allowed. The defendant also contends that he should have been allowed to cross-examine Detective Spearman about whether he thoroughly investigated alternative suspects after he testified on direct examination that he had investigated other suspects.

On direct examination, the state questioned Detective Spearman regarding other possible suspects. The defendant objected to the state's asking Detective Spearman whether he had checked the alibis or whereabouts of others, including Moses Bess, whom the defendant had named as possible suspects. Also over the defendant's objection, Detective Spearman testified that he had spoken with the person whom Mr. Bess said he was with, and she supported his statement. Additionally, the state asked if Detective Spearman was aware of any link between Mr. Bess and Victory Cantrell. The defendant objected to this question, as well as when Detective Spearman was asked whether Danny Burnett accounted for his whereabouts at the time of the homicide. The state also asked Detective Spearman whether he had interviewed Brian Blair and found "any connections between Brian Blair and Victory Cantrell," and over the objection of the defendant, Detective Spearman responded that he had not.

-32-

In State v. Kilburn, 782 S.W.2d 199, 204 (Tenn. Crim. App. 1989), the court considered a similar situation. During the trial, the defendant tried to focus suspicion on a Mr. Stevenson, who apparently had been intimate with the victim's wife. Responding to this proof, the state asked an investigator about this matter, and he responded that he had investigated Mr. Stevenson's alibis and found them to be credible. Id. The defendant objected to this testimony, arguing that it was hearsay based upon out-of-court statements by others. This court rejected the state's claim that the testimony was admitted not for the truth of the matter asserted. Moreover, the court stated that even if the testimony was not hearsay, its prejudicial effect outweighed its probative value "on this critical element of the defense." Id. We conclude, likewise, that the prejudicial effect of allowing Detective Spearman to testify about the results of his investigation of Moses Bess, Danny Burnett, and Brian Blair outweighed its probative value. However, because these witnesses testified at the trial and were subject to extensive questioning by the defendant, we conclude that the error in admitting Detective Spearman's testimony was harmless.

On cross-examination, the defendant asked Detective Spearman a number of questions regarding others who might have killed the victim. Detective Spearman testified that the defendant told him that the murderer might have been "Danny," whom Detective Spearman identified as Danny Burnett. Mr. Burnett subsequently testified at the trial. Detective Spearman also testified, in response to the defendant's questions, that Regina Cantrell, known as "Boo," had caused a dent or kicked the victim's car and apparently fought with her. He also stated that the defendant told him that he had once seen "Boo beating [the victim] half to death." The defendant also questioned Detective Spearman about the defendant's statement that the defendant's sister was told by "Boo" that she or the victim (the statement is unclear as to which) was with "four other guys, two white guys" the last day that the victim was seen alive. Detective Spearman testified that Regina Cantrell did not confirm to him that she made this statement. He also testified that he did not know Ms. Cantrell's whereabouts or whom she was with on the last day that the victim was seen alive. The defendant also questioned Detective Spearman about his investigation as to the whereabouts of other possible suspects. Detective Spearman acknowledged that he attempted to determine whether Regina Cantrell was with the victim or with Danny Burnett the last day the victim was seen alive. He was not asked to explain the results of that investigation. Detective Spearman said that he submitted blood samples from Victory Cantrell, Moses Bess, Brian Blair, and Danny Burnett for analysis and that defense counsel had accused Mr. Burnett of committing the crime. He said that samples were not submitted for Andre "Slick" Drennon or Raymond Miles.

The defendant sought a bench conference before asking Detective Spearman about certain investigative efforts:

> MR. DANIEL: Your Honor, let me explain. The reason why I want to do it with this witness is to find out what information he developed; that is, what he looked into with regard to the witness' whereabouts right afterwards. It's our contention that within a short time after this event, that he ran off to Florida with his girlfriend.

GEN. PRICE: The thing that's competent is whether he looked into his whereabouts. He'll say that, but to say where he went, who he went with, how long he was gone, and, most particularly, why he went, that's totally improper. It's got to be hearsay as to his whereabouts. It can't be anything else.

THE COURT: I won't argue that.

MR. DANIEL: I won't ask that question then.

Later in the trial, Danny Burnett was called by the defendant to testify. He denied that the victim told his parents that he used drugs or spent money they had given him to buy drugs, saying that his parents had known about his drug usage since his early teens and had helped at times to support his habit. He denied seeing the victim on the last day that she was alive, saying that he had been released from jail at 8:15 that morning and went to his grandmother's house, where he stayed until between 6:00 and 8:00 p.m., when he and Fran Fuller went to Nashville and stayed until 10:00 or 11:00 p.m. He said that they then went to Ellen Hickey's house. He also denied being angry with the victim for speaking with his parents about his drug use or saying, "I'll get the bitch for this," referring to the victim. He testified that after his release from jail on January 4, 1995, he was arrested again on January 7 or 8 and again released on his own recognizance. He then went to Florida because he expected to be taken into custody for another charge that day.

The defendant was entitled to "prove by competent evidence that there was another individual who was inclined to commit the offense," or that another person did commit the offense. State v. Spurlock, 874 S.W.2d 602, 612 (Tenn. Crim. App. 1993). It is unclear, though, what evidence the defense was prevented from showing. No proffer of such evidence was made. Furthermore, the defendant questioned Brian Blair, Moses Bess, Danny Burnett, and William C. Clark at length during the trial. During the testimony of William C. Clark, the defendant presented the following to the jury:

> Q. And you had a conversation with Ms. Coleman related to Danny Burnett?
>
> A. Yes, sir.
>
> Q. And what was that conversation?
>
> A. She told me that she was afraid of Danny because he had threatened her, to kick her ass, if I may say that, because she had went to his father to get the money that he owed her.

Although Regina Cantrell was not called to testify, the defendant elicited substantial testimony regarding problems between her and the victim. Also, we note that Cindy Nowlin testified that the

-34-

victim told her she was slapped by Moses Bess within two days before her death. Thus, it is unclear what evidence the defense counsel possessed as to others with a motive for the homicide that he did not present in one fashion or another.

As an additional related objection, the defendant contends that the trial court erred in ruling that the out-of-court statements concerning other suspects could only be hearsay and could not be deemed admissions or material evidence. Although the defendant has cited arguments between counsel on this general point, the trial court never made such a ruling. No such instruction was made during the trial court's jury charge at the conclusion of the proof. We agree with the state that the defendant has failed to show that he was prevented from using any evidence or statements which should have been admissible pursuant to Spurlock.

The defendant also claims that he was not allowed to show that the police received a telephone call from an anonymous person, later identified as Carlene Hartley, who said she had seen the victim in a car with Danny Burnett after the death allegedly occurred. The defendant argues that he wanted to confront Detective Spearman with this information to show how he failed to follow up on information that would indicate facts contrary to the state's theory.

In fact, defense counsel questioned Detective Spearman about the anonymous telephone call:

> Q. Did you get an anonymous phone call from somebody saying that they had seen the victim alive after the death had occurred?
>
> A. Yes, sir.
>
> . . . .
>
> Q. And did you determine who the anonymous phone caller was?
>
> A. Yes, sir, I did.
>
> Q. And that was who?
>
> A. I believe the name was Carlene Hartley.

Later, Detective Spearman testified during cross-examination that the information from this caller was not accurate:

> Q. Now, you have stated that you found out that the information she gave you was incorrect; is that right?
>
> A. Yes, sir.

Q. And how did you determine the information that she gave you was incorrect?

A. By the location of [the victim's] vehicle.

. . . .

Q. And you don't have then anything further about that other than the fact that you said that the car wasn't there; that is, any reason why her information was incorrect, because she said the car was at a Texaco?

A. No, sir. She claimed to have seen the car, but she was unsure of the night. She thought the night was possibly Tuesday, which would have put it two days prior to Ms. Coleman's time of death. I did investigate and notice that her vehicle was left parked at that Texaco on that Tuesday night. So that would have put the date that she possibly seen the car – could have been further back on Monday.

Also, Carlene Hartley was called as a defense witness and testified that she saw the victim on the evening of Wednesday, January 4, 1995, when the victim and Danny Burnett came to her house between 10:30 and 11:00 p.m. Ms. Hartley testified that she saw the victim's car the next day, and that it was being driven by Mr. Burnett. On Friday, January 6, 1995, she learned of the victim's death and, in response to an appeal broadcast on television seeking information about the crime, left a voice mail message with the police, giving this information about seeing the victim and her car.

Regarding the anonymous telephone call, the defendant states that he wanted to confront the detective with the statements made by Ms. Hartley during the call to show how he failed to follow up on information that would indicate facts contrary to the state's theory. However, Detective Spearman related during cross-examination much of what Ms. Hartley said when she telephoned anonymously and explained his basis for testifying, also during cross-examination, that her information was not correct. Additionally, the substance of this telephone call was made known to the jury by Ms. Hartley's testimony. Further, Danny Burnett testified regarding much of the information from Ms. Hartley's anonymous telephone call, denying that he had been with the victim on January 4. Mr. Burnett also testified that although he had twice ridden in the victim's car, he had never driven it. He stated that he had gotten out of jail the morning of January 4 and was arrested again on January 7 or 8 for shoplifting. Following his release from jail the second time, he went to Florida and learned of the victim's death while he was there. He denied ever threatening to kill the victim.

We disagree with the claims that the defendant makes as to the handling of this matter. We agree with the ruling of the trial court that the substance of the statement made by the then anonymous tipster was hearsay. See West End Recreation, Inc. v. Hodge, 776 S.W.2d 101, 106 (Tenn. Ct. App. 1989) ("An unidentified informant's comments are hearsay and are allowed only if

the comments fall within another exception."). However, even if the trial court ruled incorrectly on this matter, as the defense asserts, we believe that the record indicates that everything the defense wanted to establish through the cross-examination of Detective Spearman about the anonymous tip was made known to the jury through him and other witnesses, although the defense may not have agreed with all of their testimony.

## I. Additional Confrontation Claims

The defendant argues that he was denied his right to confrontation as to certain evidence and certain witnesses. We examine each of the claims for the presence and effect of any error. See State v. Howell, 868 S.W.2d 238, 253 (Tenn. 1993) (recognizing that Confrontation Clause violations are subject to harmless error analysis).

The defendant complains that he was denied his right to cross-examine and confront Detective Spearman concerning his own notes. This assignment refers specifically to the anonymous information given to Detective Spearman, which actually came from Carlene Hartley. The defendant wanted to ask Detective Spearman what she told him at that time. We have already noted that the defendant, in cross-examining Detective Spearman, brought out much of the information in the anonymous tip. Further, Carlene Hartley later testified on behalf of the defendant regarding this telephone message. Additionally, Danny Burnett, whom Ms. Hartley claimed she saw driving the victim's car after the victim's death, was called by the defendant and testified regarding the information which Ms. Hartley provided to Detective Spearman. Accordingly, even if the trial court made an erroneous ruling regarding the defense cross-examining Detective Spearman about this anonymous telephone call, the error was harmless beyond a reasonable doubt.

The defendant also complains that he was improperly limited in his redirect examination of Moses Bess when the trial court ruled that it was beyond the scope of cross-examination. He contends that this was error because the state gave him an inaccurate and incomplete copy of the audiotaped statement of Mr. Bess. As we have previously discussed, the appellate record does not contain a copy of either version of the recorded or written statements. Accordingly, this issue is waived. See T.R.A.P. 24(b); State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). In any event, we cannot conclude that the trial court erred in its ruling in this regard.

The defendant also claims that he was denied his right to confrontation when the trial court did not allow him to question TBI Agent Sandra Evans about drug paraphernalia found in the victim's apartment. We have previously discussed this claim and concluded that the trial court limited the defendant's cross-examination of this witness regarding drug paraphernalia found in the victim's apartment because it was catalogued by another TBI agent, whom the defendant did not call as a witness. We do not believe that the trial court erred in this regard.

## J. Detective Spearman's Testimony Regarding the Time of Death

The defendant complains that Detective Spearman was allowed to give an unfounded opinion as to the probable time of death. The trial court's ruling on this point was made after Detective Spearman was asked what Dr. Harlan initially told him concerning the time of death. After that question was asked by the state, the following exchange occurred:

> MR. DANIEL: If your Honor please, I object to that.
>
> THE COURT: He's already testified.
>
> GEN. PRICE: Your Honor, I understand he's testified, but I think it's significant for this detective to know and clearly indicate that he knew from his conversation what period of time he was looking at with regard to this investigation. That's the purpose for it. It's not to establish it or not establish it.
>
> THE COURT: Okay.
>
> MR. DANIEL: Judge, if he's going into preliminary statements of time of death or something, they could have asked Dr. Harlan about that, in which case it would be, but they–
>
> THE COURT: I get the impression that this is not being asked for the truth of the matter asserted but rather what he had to go on when he started his investigation. For that limited reason, I will allow it. This is what he had to go on when he started his investigation.

Detective Spearman was then allowed to testify that he was told at the scene that the approximate time of death was within forty-eight hours.

The defendant argues that allowing Detective Spearman to testify concerning what Dr. Harlan told him about the time of death violated his due process and confrontation rights. The trial court concluded that the statement made by Dr. Harlan to Detective Spearman was not hearsay because it was offered not to prove the truth of the matter asserted but to establish why Detective Spearman began his investigation as he did. See Tenn. R. Evid. 801(c). We conclude that the trial court did not err in this ruling. Additionally, we note that because the defendant later recalled Dr. Harlan to testify, even if there were error in admitting this statement, it was harmless.

## K. Admissions

The defendant contends that the trial court erred in ruling that statements made by the victim shortly before the offense were inadmissible hearsay. He argues that the statements regarding other

persons who had motive and opportunity to commit the crime were admissible as admissions. The defendant has provided no argument or citation to authority for his position. We cannot conclude that the trial court erred in ruling that these statements were inadmissible hearsay.

The defendant next contends that the trial court should have allowed Steven Waldron to testify that a prosecutor told him that the defendant was not guilty and that they had the wrong man. As to the alleged admission of the prosecutor, we have already concluded that the trial court did not err in not allowing this testimony.

The defendant also argues that the trial court erred in holding that the statement made by Brian Blair to Detective Spearman concerning his presence with the victim from 7:00 p.m. until 10:00 p.m. on the night of her death was not an admission but was hearsay which had no probative value. As we have previously discussed, the defendant attempted to question Detective Spearman about this alleged statement. After an unfavorable ruling from the trial court on this matter, the defendant moved, unsuccessfully, for a mistrial. We have previously concluded that this statement was not admissible in the manner in which defense counsel attempted to introduce it. We also conclude that the trial court did not err in denying a mistrial following its ruling in this regard.

### L. Discoverable Material

The defendant makes several claims as to exculpatory and discoverable material which was not provided to him. Specifically, the defendant claims that the statement of Brian Blair during his redirect examination that the victim was afraid of "Regina's boyfriend," who was the defendant, was not brought out on direct examination, was not provided in discovery material, and was contrary to Jencks material provided to the defendant, see Jencks v. United States, 353 U.S. 657, 77 S. Ct. 1007 (1957). As to this claim, we note first that this statement was inculpatory, not exculpatory, and not required to be disclosed. State v. Spurlock, 874 S.W.2d 602, 613 (Tenn. Crim. App. 1993). Additionally, according to the state, the witness advised it of this fact the previous day, and the fact was not in his written statement. Thus, we cannot conclude that the trial court erred in allowing this testimony.

The defendant also contends that the trial court erred in allowing Robert Muehlberger to testify regarding certain expert opinions about the defendant's handwriting which were not in the pretrial discovery information and were outside the scope of the witness's expert qualifications. The defendant complains about three specific items of testimony by this witness: (1) that, in his opinion, the victim was lying down, not standing up, when the words were written on her stomach, (2) that it appeared the victim was not moving when the words were written on her, and (3) that there was no smearing of the writing, as might have occurred if she had later worn clothes or had body contact with someone. After Mr. Muehlberger's testimony and after the jury was excused, the defendant moved for a mistrial, arguing that Mr. Muehlberger's opinion had not been set out in either of the expert's reports which had been furnished to him and that Mr. Muehlberger had not spoken of these opinions when he interviewed him before the trial.

Rule 16(a)(1)(D) of the Tennessee Rules of Criminal Procedure provides that the prosecution shall allow the defendant to copy reports of examinations and tests, which was done in this case. However, these reports, while setting out the conclusion that the handwriting on the victim's body was that of the defendant, did not contain the additional opinions of which the defendant now complains. The defendant does not show or allege that these were intentionally omitted from the report. Additionally, we note that the defendant does not allege that the expert witness misled him in his pretrial interview, or that the state did so either. Furthermore, although Mr. Muehlberger testified on January 24, 1997, on direct examination, the trial court allowed defense counsel to reserve his cross-examination until January 30, 1997, when the state concluded its proof. Based upon the additional time granted to the defendant in this regard and the nature of the cross-examination of the witness, the defendant was not prejudiced by the fact that Mr. Muehlberger's report did not set out all opinions as to which he would testify. Accordingly, we cannot conclude that the admission of these opinions should have resulted in a mistrial, the granting of which is within the discretion of the trial court.

The defendant next complains that prejudicial error occurred when the state did not reveal the anonymous telephone call regarding the victim's death, it later being determined that this call was placed by Carlene Hartley, who testified at the trial. It is not clear when the defendant learned of Ms. Hartley's telephone call. However, we note that counsel interviewed Ms. Hartley before the trial and, in his opening statement, made reference to the alleged fact that the victim's automobile was being driven after her death, one of the claims made in Ms. Hartley's call. Additionally, he questioned Detective Spearman about Ms. Hartley's claims that the victim's automobile was being driven after her death supposedly occurred. Later in Detective Spearman's testimony, the defendant questioned him further regarding his investigation of the claims made by Ms. Hartley and why he concluded that the information was incorrect. Also during Detective Spearman's testimony, the defendant argued about this telephone call with the state, specifically referring to the call. Thus, it is clear that defense counsel knew of this call from the beginning of the trial and utilized that knowledge in the defense. We see no error.

## V. PROCEDURAL AND EVIDENTIARY RULINGS

The defendant presents a number of arguments regarding the trial court's rulings. He complains that the state badgered and abused Carlene Hartley and impeached her using inadmissible information and that the trial court improperly allowed all three prosecutors to argue during her testimony as well as on two other occasions during the trial. He also complains that the trial court should not have allowed the state to introduce into evidence a picture of the victim with her children for which there was no evidentiary basis. The defendant further argues that the trial court should not have allowed Moses Bess to take a transcript of his prior statement into the witness box and review it during a recess. We will now consider each of these claims.

We have already considered many of the defendant's arguments as to the cross-examination of Carlene Hartley and noted that the propriety and form of cross-examination is within the sound discretion of the trial court. State v. Hutchison, 898 S.W.2d 161, 172 (Tenn. 1994). We conclude

that the trial court did not abuse its discretion in allowing the state to cross-examine this witness as it did.  See State v. Caughron, 855 S.W.2d 526, 541 (Tenn. 1993).

The defendant cites two occasions other than the cross-examination of Ms. Hartley when multiple prosecutors were allowed to argue on the same point.  The record reveals that the defendant did not object on either occasion.  Therefore, this issue has been waived.  See T.R.A.P. 36(a).

During the cross-examination of Moses Bess, the state introduced a photograph of the victim and her two young children.  Defense counsel objected that the photograph had no evidentiary purpose and was used for sympathy purposes.  The state responded that the purpose was to show the victim's appearance during her lifetime and that it was relevant because the defense had "made a big issue about these children."  Tennessee courts are liberal in allowing the admission of photographs. State v. Morris, 24 S.W.3d 788, 810 (Tenn. 2000).  Although this photograph appears to be of questionable relevance, its admission certainly did not affect the outcome of the trial.  Any error in its admission was harmless.  State v. Strouth, 620 S.W.2d 467, 472 (Tenn. 1981).

As for the defendant's claim that the state erroneously allowed Moses Bess to have a copy of his witness statement as he was testifying and to review it during a weekend break in the trial before continuing his testimony, the record reflects no detriment to the defendant.  Mr. Bess testified, in response to questions in this regard from defense counsel, that he reviewed his statement before testifying but had not looked at it since.  Although a copy of it was on the witness stand while he was testifying, Mr. Bess said he had not looked at it and, in fact, could not read it without reading glasses. The defendant has established no prejudice in this regard.

We note that the defendant listed but made no argument regarding the following issues – that he was not allowed, in final argument, to use direct quotes from the transcript; that the court erroneously denied his motions for judgment of acquittal and his motion in limine seeking to exclude evidence; that the court erred in not ordering the prosecution to furnish a copy of the notes from the police officer's conversation with the defendant on January 18, 1995; and that the court erred in allowing the state to introduce evidence of "contradictions" in the transcripts.  Our review of the record reveals no error regarding these claims.

## VI.  IMPROPER ARGUMENTS

The defendant complains about numerous portions of the state's closing argument.  First, he argues that the trial court committed plain error by overruling his objection to the state's argument about the burden of proof as to the facts.  The defendant argued during his closing as follows:

> We are here to decide what has the State established with regard to whether or not Lonnie Turner actually committed the offense charged. And can the State say beyond a reasonable doubt and to a moral certainty it has satisfied you with all of the facts that they're relying on to prove the case in the circumstance.

The following exchange then occurred during the State's rebuttal argument:

> GEN. WHITESELL: Mr. Daniel also tells you that the State has to prove every fact that we rely on beyond a reasonable doubt. And I challenge you Ladies and Gentlemen, to listen to the Court's instruction to see if you hear that phrase. You will not I submit. You will hear the Court tell you that the State has to prove every element of the offense. Every element of the offense. You determine the facts, and you determine if those facts prove that element.

> MR. DANIEL: If Your Honor please, I object to that statement as being –

> THE COURT: I'll charge the jury as to what they have to do.

> MR. DANIEL: -- an error and [deprecating] the obligation of the State to prove the proof. What the statement the Court will charge upon in regard to the elements and the facts themselves. If the State -- if the Defendant -- if the State is going to rely upon a fact, it has to prove that fact beyond a reasonable doubt.

> GEN. WHITESELL: Ladies and Gentlemen, if you hear the Court charge you: If the State is going to rely on a fact, they must prove that fact beyond a reasonable doubt, find this Defendant not guilty. We have to prove the elements of the offense. And as Mr. Price told you, we are relying on the element that this woman was unlawfully killed during the commission of the Felony of Aggravated Rape.

The defendant now argues that this calculated, intentional statement carried great weight with the jury and allowed them, contrary to law, to find the defendant guilty simply by finding that someone killed her during the commission of a rape and permitted a finding of guilt based upon a lesser standard than that required by the Constitution. The defendant argues that this is plain error, requiring us to set aside his convictions and grant an acquittal. We disagree.

In the charge to the jury, the trial court used the Tennessee Pattern Jury Instruction as to circumstantial evidence:

> Circumstantial evidence consists of proof of collateral facts and circumstances which do not directly prove the fact in issue but from which that fact may be logically inferred. When the evidence is made up entirely of circumstantial evidence, then before you would be justified in finding the defendant guilty, you must find that all the essential facts are consistent with the hypothesis of guilt, as that is to

-42-

be compared with all the facts proved; the facts must exclude every other reasonable theory or hypothesis except that of guilt; and the facts must establish such a certainty of guilt of the defendant as to convince the mind beyond a reasonable doubt that the defendant is the one who committed the offense. It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to justify the jury beyond a reasonable doubt of all the facts necessary to constitute the crime charged. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole to a satisfactory conclusion and producing in effect a moral certainty that the defendant, and no one else, committed the offense.

T.P.I. – Crim. 42.03.

The defendant did not object to this charge. The defendant's argument that the state had to prove "beyond a reasonable doubt and to a moral certainty . . . all of the facts" upon which it was relying was not an accurate statement of the law. The state correctly responded that the court would not charge the jury as the defense had suggested but that the state had to prove every element of the offenses. The defense does not claim that the jury was not correctly instructed as to the burden of proof. It simply does not follow that the jury could have believed that it could find the defendant guilty "simply by finding that somebody had killed her during the commission of a rape." This argument ignores the fact that no claims were made that the jury was not correctly instructed as to the burden of proof and is presumed to have followed those charges.

Next, the defendant complains that no proof supported the state's comment that the defendant flew Carlene Hartley in from Louisville, Kentucky, and the defendant's investigator picked her up at the airport. The trial court granted the defendant's objection that this argument was outside the record by stating, "All right. Stay within the record, General." Although the trial court did not instruct the jury regarding the improper argument, the defendant did not make any further objection or request regarding this matter. See T.R.A.P. 36(a). In any event, we do not see prejudice resulting in an unfair verdict.

The defendant also claims that the state falsely stated that the DNA analysis of semen on the flashlight eliminated all of the other suspects. The state actually argued that Mr. Minor testified that "the semen on that flashlight, the DNA profile eliminated everyone except this Defendant to - - the odds were 1 - - was it 2.1 billion people?" The defendant's objection to this argument appears to be one of semantics, rather than of the accuracy of the statement. We cannot conclude that this argument was improper.

The defendant next contends that the prosecutor stated that "the only proof in the record was that the Defendant had sex with the victim on Monday night" but that Carlene Hartley testified that the victim told her it occurred on Tuesday night. We agree that Ms. Hartley testified as the defendant

asserts. However, the defendant did not object to this argument, and therefore, has waived this issue. See T.R.A.P. 36(a).

The defendant next contends that the state made an improper argument regarding his jacket. We note that Detective Spearman testified that the defendant said that he hung his coat on a chair at the victim's apartment and that a man's jacket was found on a chair in her apartment. During final argument, the state characterized this proof by saying: "Detective Spearman says that [the defendant's] jacket was found in the apartment. And there was a man's jacket found in the apartment, and he made a statement about a man's jacket." This argument accurately restates the testimony. Accordingly, this issue is without merit.

The defendant claims that the state argued, without any basis in the proof, that "the only way the victim would let you into her apartment is if he was going to share [some] crack with her and the only way she would let you in to smoke crack is if you have some to share with her." Taken in context, we cannot conclude that it was outside the bounds of legitimate argument.

The defendant also argues that the prosecutor stated that the defendant's sister lived across the hall in Imperial Gardens when there was no such evidence in the record. Again, the defendant did not object to this argument, and therefore, has waived this issue. See T.R.A.P. 36(a).

We agree with the defendant that it was improper for the prosecutor to make reference in his closing argument to "[t]he Jeffery Dahmers, the David Berkowitzs, the Ted Bundys. You don't find murder there. You don't find motive there. Motive is a reason." This court, in Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976), set out the following considerations for determining whether the state's improper conduct could have prejudiced the defendant and affected the verdict:

1. The conduct complained of viewed in context and in light of the facts and circumstances of the case.

2. The curative measures undertaken by the court and the prosecution.

3. The intent of the prosecutor in making the improper statement.

4. The cumulative effect of the improper conduct and any other errors in the record.

5. The relative strength or weakness of the case.

In this case, the prosecutor twice likened the defendant to notorious serial killers. Each time, the defense counsel objected, but the trial court did not take proper remedial action, which would have included instructing the jury to disregard the clearly improper comments. However, taking the

comments in context with all of the proof and the entire arguments, we cannot say that they affected the verdict.

## VII. SENTENCING

The defendant argues that it was unjust for the trial court to order his first degree felony murder and aggravated rape sentences to be served consecutively. He also argues that consecutive sentencing for these offenses violates the double jeopardy provisions of the Tennessee and United States Constitutions. The defendant next argues that the trial court ordered consecutive sentencing without making appropriate findings or showing that consecutive sentencing was necessary to protect the public from future criminal conduct by the defendant. Finally, he argues that the trial court ordered consecutive sentencing without giving consideration to the defendant's proof at the sentencing hearing.

The proof presented at the sentencing hearing by the state consisted of the testimony of Deborah Lynn Vickers, who said that as she was walking from her disabled car on July 28, 1994, the defendant came from behind her, hit her in the head with a rock, and stole her purse. The attack caused the victim to go into labor and deliver her daughter three weeks prematurely. For this offense, the defendant was convicted of robbery and sentenced to six years, with the possibility of a suspended sentence after service of twelve months. The state introduced judgments against the defendant showing that he was convicted of vandalism under $500 on December 3, 1990, and sentenced to eleven months, twenty-nine days, with all but five days suspended and that he was convicted of assault on June 20, 1993, and sentenced to ninety days confinement, the sentence being suspended and the defendant being placed on probation for twelve months.

The defense witness at the sentencing hearing was James H. Johnson, who was seventy-five years old and apparently the defendant's grandfather. Mr. Johnson testified that the defendant's three minor children lived with him and his wife until the defendant's arrest. He stated that he raised the defendant from age five and that the defendant took care of his children, who loved him.

The trial court found that the defendant knowingly devoted himself to criminal acts as a major source of his livelihood and that the defendant had an extensive record of criminal activity. See Tenn. Code Ann. § 40-35-115(b)(1), (2). The court also found that the defendant was a dangerous offender, stating that his behavior indicated little or no regard for human life and that he had no hesitation, in the present or in past offenses, about committing a crime in which the risk to human life was high. See Tenn. Code Ann. § 40-35-115(b)(4). The trial court ordered the rape sentence to run consecutively to the murder sentence, with both sentences ordered to run consecutively to a prior robbery sentence.

When a defendant appeals the manner of service of a sentence imposed by the trial court, this court conducts a de novo review of the record with a presumption that the trial court's determinations are correct. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all

relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appealing party. Tenn. Code Ann. § 40-35-401(d), Sentencing Commission Comments. However, if the record shows that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the sentence is purely de novo. Ashby, 823 S.W.2d at 169.

To base consecutive sentences upon the dangerous offender classification, the trial court must find that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn.1995); State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999). The defendant correctly argues that the trial court did not make the required Wilkerson findings.

The trial court found by a preponderance of the evidence that a major source of the defendant's livelihood resulted from selling cocaine, stating that the record was replete with evidence that the defendant was a drug dealer. Moreover, the presentence report states that the defendant only had one part-time job for about one year since graduating from high school in 1989. Given the evidence of the defendant's drug dealing, we cannot say that the trial court erred in this finding.

The trial court also found that the defendant's record of criminal activity was extensive. Again, the trial court found that the defendant had sold and used cocaine. Also, the defendant, who was twenty-seven years old at the time of sentencing, had been convicted of vandalism, assault, and robbery. The presentence report reveals that the defendant was supposed to report to the workhouse to begin serving his robbery sentence on January 2, 1995, but he failed to do so, committing the present offenses two days later. The trial court did not err in finding that the defendant's record of criminal activity was extensive. Accordingly, ordering the defendant to serve consecutive sentences was not improper. Finally, the defendant's claim that consecutive sentences cannot be imposed for felony murder and the underlying felony is without merit. See State v. Blackburn, 694 S.W.2d 934, 936-37 (Tenn. 1985); State v. Brown, 756 S.W.2d 700, 703 (Tenn. Crim. App. 1988).

## VIII. NEWLY DISCOVERED EVIDENCE

The defendant contends that the trial court should have granted him a new trial based upon newly discovered evidence. This evidence consisted of the fact that Moses Bess had allegedly made numerous previous threats to kill other persons and had indicated to his own son a propensity for violence and willingness to kill other persons arising out of his concern and the knowledge of his wife's sexual acts and drug use with African-Americans. As additional newly discovered evidence, the defendant cites the fact that after the trial of this matter, Moses Bess was convicted of the aggravated rape of a child and sentenced to a term of fifteen years.

The decision to grant or deny a new trial on the basis of newly discovered evidence is a matter that rests in the sound discretion of the trial court. State v. Goswick, 656 S.W.2d 355, 358 (Tenn. 1983). However, a new trial will not be granted if it appears that the newly discovered evidence merely discredits the statements of a witness or impeaches the witness unless the testimony

which is being impeached was so important and the impeaching evidence so convincing that a different result must result. Rosenthal v. State, 200 Tenn. 178, 186, 292 S.W.2d 1, 4-5 (1956).

In this case, the new evidence consisted of statements in the affidavit of Joseph Michael Bess, the son of Moses Bess, that Moses Bess had shot and killed his former wife a number of years earlier; that he had "boasted that he had gotten away with a first degree murder charge in New Mexico"; that he had killed people and "their bodies would never be found"; that he was violent and had threatened to kill his son and other persons; that he changed his appearance after the victim's death and acted scared; and that he had stated both before and after the victim's death, "I was a killer in Vietnam and I'm a killer now." He had also made statements that the victim was smoking crack and having sexual relations with African-American men and that he "was getting tired of it."

In the trial court's order denying a new trial on the basis of this evidence, the court stated that if the jury had been made aware of everything Joseph M. Bess alleged, then the evidence "could have possibly made a difference." However, the court commented that the credibility of Joseph M. Bess, would have been questionable because of his felony convictions. The court also noted the strength of the state's case, specifically that a handwriting expert testified that the defendant's handwriting was on the victim's body.

Even assuming, arguendo, that all of this additional evidence would have been admissible, it is clear that its sole purpose would have been to impeach Moses Bess and make it appear that he might have killed the victim. We note that the defendant presented evidence that Moses Bess had struck the victim. Moreover, in view of all the evidence, including the expert testimony that it was the defendant who wrote "VICKTORY CANTRELL" on the victim's stomach, as the trial court noted in its ruling, it is equally clear that this evidence would not likely have changed the result of the trial. See State v. Caldwell, 977 S.W.2d 110, 117 (Tenn. Crim. App. 1997).

## IX. CONCLUSION

Based upon the foregoing and the record as a whole, we affirm the judgments of conviction.

_____
JOSEPH M. TIPTON, JUDGE